**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

**Pg: 58 Ln: 14 - Pg: 59 Ln: 11**

**Annotation:**

```
58:14   Q.   Let me ask you, that forensic engineering
     15   billable work, is it fair to say that would have
     16   been on clients or matters for George, Marc and
     17   C.J.?
     18        A.   Initially.
     19        Q.   Right.
     20        A.   Initially, yes.
     21        Q.   Right.  Meaning, again, you didn't come
59: 1   into a proposed business, as I said, with an
      2   established book of clients or matters, correct?
      3        A.   That's not the word I would use, but I
      4   understand what you're saying, correct.
      5        Q.   Yeah, again, I understand you've got
      6   experience in your background as a trained and
      7   certified engineer.  But, again, as far as the
      8   clients who were going to pay your bills, you didn't
      9   have any of those types of clients established at
     10   this point in 2016.  Is that fair?
     11        A.   That's correct.
```

**Note:** Designation

**Pg: 71 Ln: 13 - Pg: 72 Ln: 3**

**Annotation:**

```
71:13   Q.   All right.  So you met her in that regard,
     14   but Ms. Feinman was not your personal accountant at
```



EXHIBIT

A

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
15    the time doing any tax work for you?

16         A.  Correct.

17         Q.  Did that change at some point, did there

18    come a time when you did engage her personally to

19    prepare your taxes or do any tax advice?

20         A.  Yes.  Once Beacon Scientific, LLC was

21    formed, I switched to her as my personal tax

72: 1 advisor.

2          Q.  Starting in tax year 2017?

3          A.  Correct.
```

**Note:** Designation

**Pg: 94 Ln: 10 - Pg: 96 Ln: 5**

**Annotation:**

```
94:10  Q.  And at least when you all started there

11    were no other employees other than the two of you;

12    is that correct?

13         A.  Correct.

14         Q.  Okay.  Was there discussions when you all

15    were forming about -- about hiring or how that would

16    work or any discussion sort of initially at

17    formation?

18         A.  Yeah, so when Mr. Saunders originally

19    approached me he realized that he was basically at

20    the maximum amount of billable hours that he could

21    make -- that he could work.  To grow, to expand, he

95: 1 needed to start to hire engineers but he had no

2     experience and did not want to manage employees.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 3      And -- but the goal was to, at least my
 4      understanding of the goal, was to go from being what
 5      I would call a lifestyle company to being a growth
 6      company.  So the goal was to reinvest as much as
 7      possible back into the company to grow.  And being a
 8      service based company, that means to hire employees.
 9          Q.   So, again, looking at your analysis, while
10      that last page that we were looking at with the
11      70,000 looks like it only sort of covered the first
12      six months.  Is it your understanding that again
13      conceptually that would -- that would continue as
14      far as expectations on your -- at least your
15      billable work and Mr. Saunders billable work?
16          A.   Yes.  I had no expectations that that was
17      going to change or need to change.
18          Q.   All right.  And, again, with the
19      understanding of you seeing this business as a
20      growth company that you would be spending your other
21      thousand hours toward management and/or growth of
96: 1   the company on an annual basis?
 2          A.   Management, administration, et cetera, et
 3      cetera.  But yes.
 4          Q.   Non-billable?
 5          A.   Non-billable, yes.
```

**Note:** Designation

**Pg: 105 Ln: 2 - Pg: 107 Ln: 11**

**Annotation:**

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

105: 2    Q.   All right.  And I think this was some of

3    your testimony earlier that there was an

4    understanding that Mr. Saunders would be able to

5    take out $400,000 for his contribution of the assets

6    of Saunders Engineering that were transferred in?

7         A.   Correct.

8         Q.   Correct.  Okay.  And is it your

9    understanding that Mr. Saunders would be able to

10    take that out at what point in time or how much.

11    Was there any understanding about that?

12         A.   My understanding was that it was

13    originally written that he could pull the money that

14    I put in, but he could pull it out at his

15    discretion.

16         Q.   Okay.  But it would be only up to the

17    amount you've paid in?

18         A.   That was my understanding.

19         Q.   Okay.  And then with regard to the

20    management committee, what did you understand as far

21    as how that would work?

106: 1         A.   At what point, at this point?

2         Q.   Yes.

3              MR. WHITWORTH:  For the record, as of

4              March 31, 2017?

5              MR. KAGAN:  Yes.

6         A.   I mean I would understand that as the

7    management committee consisted of three members,

8    myself, Mr. Saunders and one other person that

9    Mr. Saunders had the right to appoint.  And that the

10    management -- management committee was responsible

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
       11    for the operation of the company in layman's terms I

       12    guess.

       13        Q.   All right.  But that you would -- you

       14    would be appointed manager for day-to-day

       15    operations?

       16        A.   That's separate from the management

       17    committee.  But, yes, there is something in here

       18    that appointed myself as manager, which I guess

       19    would be section 5.1.6, to supervise the day-to-day

       20    operations under the supervision and control of the

       21    management committee.

107: 1        Q.   All right.  And was there any point in

        2    time where you and Mr. Saunders had to -- had to

        3    make any decisions through the management committee?

        4        A.   The management committee never formally

        5    met or made any decisions to policies.

        6        Q.   And is that because you were managing

        7    day-to-day and it was the two of you and you were

        8    able to communicate?

        9        A.   It was the two of us.  There was never a

       10    third member -- sorry, third management committee

       11    member appointed, and we talked almost every day.
```

**Note:** Designation

**Pg: 112 Ln: 16 - Pg: 113 Ln: 12**

**Annotation:**

```
112:16    Q.   Okay.  With regard to the drafts you

       17    received of the operating agreement and the loan
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

        18      agreement, did you at any time consult your own

        19      attorney with regard to these documents?

        20           A.   No.  I believed Mr. Rife was my attorney.

        21           Q.   And did you also understand or believe

113: 1      that Mr. Rife was Mr. Saunders' attorney?

         2           A.   Yes.

         3           Q.   And did you in your mind see any issue or

         4      conflict in that type of representation?

         5           A.   No.

         6           Q.   Okay.  Have you ever entered into an

         7      operating agreement prior to Beacon Scientific?

         8           A.   No.

         9           Q.   How about, I don't know, a private loan

        10      agreement that is separate from a commercial sort of

        11      bank loan?

        12           A.   No.


**Note:** Designation



**Pg: 162 Ln: 18 - Pg: 163 Ln: 20**

**Annotation:**

162:18  Q.   What's your recollection as to when Beacon

        19      started actually operating.  You all signed it on

        20      June 23rd.  Was there any sort of official start

        21      date or when did Beacon start billing, sending

163: 1      invoices?

         2           A.   I believe it was July 1st of 2017.

         3           Q.   And did you all have a physical office

         4      when you started?

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 5          A.   No.

 6          Q.   And you both worked from your homes?

 7          A.   Yes.

 8          Q.   At some point did -- did you all get a

 9     physical office?

10          A.   Not while I was a member.

11          Q.   Okay.

12          A.   Or an employee.

13          Q.   All right.  And then what cash was used to

14     start Beacon Scientific?

15          A.    I made a $50,000 payment against the loan.

16          Q.   Okay.  And did you have discussions with

17     Mr. Saunders about that, that you would put this

18     $50,000 in towards the loan right from the

19     beginning?

20          A.   Yes.
```

**Note:** Designation

**Pg: 163 Ln: 21 - Pg: 165 Ln: 10**

**Annotation:**

```
163:21  Q.   Okay.  And once Beacon started operating,

164: 1    can you tell us generally what your duties and

     2    responsibilities were, sort of from day one as far

     3    as what you were doing?

     4        A.   Well, I would say it was a two person

     5    company and George's responsibility was to continue

     6    doing forensic engineering, so I was responsible for

     7    everything else.  Would you like me to list more of
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

8      everything else?

9          Q.   Sure.

10         A.   I set up and maintained the accounting,

11     except for a few tasks that Mr. Saunders retained.

12     He deposited all the checks.  He reconciled the

13     checking and savings account.  He did his own time

14     entries and most of the invoicing, at least the ones

15     that required his time.  I managed insurance, health

16     insurance, liability insurance, workers

17     compensation.  And I managed our employee, once we

18     had an employee.  I maintained evidence storage.  I

19     created policies.  I managed and took care of all

20     the laboratory equipment.  Did some marketing.  And

21     I spent a significant amount of time doing forensic

165: 1   engineering.  I'm sure I missed some tasks in there

2      but.

3          Q.   Fair enough.  If you go back in the

4      binder.  If you go back to your C.V. for Aither,

5      which is Exhibit 3.  Under professional experience,

6      you actually have a description of your work at

7      Beacon Scientific.  Do you see that?

8          A.   I do.

9          Q.   All right.  Is that -- is that accurate?

10         A.   Yeah, I would say so.

**Note:** Designation

**Pg: 166 Ln: 9 - Pg: 167 Ln: 7**

**Annotation:**

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

166: 9   Q.   You mentioned an employee.  When did

10   Beacon Scientific hire an employee?

11        A.   I don't think I can give you an accurate

12   date.

13        Q.   Was it sometime in 2017, sort of six

14   months after the business --

15        A.   No, it was not in 2017.

16        Q.   Do you think it was in 2018 at some point?

17        A.   2018, 2019.  Beyond that I'm not sure I

18   can get more specific without some type of something

19   to show me.

20        Q.   And that employee, is that Tony

21   Bochicchio?

167: 1        A.   Yes, and yes.

2        Q.   And is Mr. Bochicchio, is he a mechanical

3   engineer?

4        A.   Yes.

5        Q.   Is he a registered professional engineer,

6   P.E.?

7        A.   Yes.


**Note:** Designation



**Pg: 174 Ln: 2 - Pg: 178 Ln: 3**

**Annotation:**

174: 2   Q.   As far as administrative bookkeeping of

3   your loan in the company books, whose responsibility

4   was that?

5        A.   Maybe I'll try to explain this, see if I

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

6    answer your question.  In Quick Books there was --

7    Ms. Feinman set up a loan account.  When a payment

8    was made, it was applied against the loan account.

9    At year end Ms. Feinman would calculate interest and

10   manually adjust per her calculations.

11        Q.   Okay.  And were you primarily the one who

12   managed the Quick Books?

13        A.   I think we had equal access and

14   responsibilities.

15        Q.   But I guess my question is as manager, as

16   part of your manager functions, meaning inputting,

17   tracking accounts payable, accounts receivable,

18   paying expenses, other inputs into that system, was

19   that your responsibility or Mr. Saunders'

20   responsibility?

21        A.   So the vast majority of expense

175: 1   transactions occurred through our credit card.  The

2    credit card transactions would be automatically

3    pulled into Quick Books and they would be

4    categorized by the person who created the expense.

5    So if Mr. Saunders used his credit card to buy

6    something, he would be the one to mark that expense

7    per what client it was being worked for, et cetera.

8    Mr. Saunders handled all deposits of checks.  So

9    when a check was put -- sorry, when there was a

10   change in savings or checking account, that was also

11   automatically brought into Quick Books.  And, again,

12   Mr. Saunders, being the one with the check, would

13   categorize the check as to who paid what invoice.

14   Other, I'll call manual entries, such as if we got a

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
15     bill that had to be paid by a check, would normally
16     come through myself.
17          Q.   Sorry.
18               MR. WHITWORTH:  Hold on.
19          A.   I did handle all set-up of clients and
20     accounts.  So if we were to have a new client or new
21     matter with the client, I'm the one who created that
176: 1     in Quick Books.
2          Q.   Okay.  Going back to your loan repayment.
3     When you pay $50,000 to the company, are you writing
4     a personal check for that to Beacon Scientific?
5          A.   No, I would do a transfer from my Navy
6     Federal account directly to Beacon Scientific's Navy
7     Federal account.
8          Q.   All right.  And then within the Quick
9     Books system would you make an entry of the $50,000
10     toward -- toward the loan or was that done by
11     Ms. Feinman.  Or Mr. Saunders.  Who would be
12     responsible for that?
13          A.   It could have been any of us.  It would --
14     it would automatically pulled in.  So when you
15     looked at the bank transactions, there would be a
16     $50,000 transfer that would have to be categorized.
17     Anyone could categorize it.
18          Q.   Okay.  I understand.  I guess did
19     Ms. Feinman have access to the system?
20          A.   Yes.
21          Q.   And did Mr. Saunders have access to the
177: 1     system?
2          A.   Yes.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
     3         Q.   I understand they had access.  But whose

     4    responsibility was it to track your loan repayments?

     5              MR. WHITWORTH:  Objection.

     6         Q.   In Quick Books?

     7         A.   In Quick Books the categorization of the

     8    payment could be done myself or Mr. Saunders.

     9    Ms. Feinman would not have gone in and done a

    10    day-to-day.

    11         Q.   I guess my question to you is as the

    12    manager of the company is who actually categorized

    13    your loan repayments?

    14         A.   I don't recall who categorized every one

    15    of them.  But it could have been either of us,

    16    Mr. Saunders knew how and I knew how.

    17         Q.   I'm asking you as far as what you

    18    understood your duties and responsibilities to be,

    19    you didn't see it as part of your duties and

    20    responsibilities to track your loan repayment in

    21    Quick Books?

178: 1         A.   No more than Mr. Saunders' responsibility.

     2    We both had access, we both entered in transactions

     3    all the time.
```

**Note:** Designation

**Pg: 178 Ln: 4 - Pg: 179 Ln: 16**

**Annotation:**

```
178: 4    Q.   Okay.  How did Mr. Saunders -- how would

     5         he know specifically when you were making a loan
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

6      repayment?

7          A.    I told him every time that I made a

8      payment so he knew that a payment was made and he

9      knew how much was paid.

10         Q.    And then you expected him as part of his

11     duties and responsibilities to go into the system,

12     into Quick Books, and track your loan repayment?

13         A.    No.  Whoever happened to be in the system

14     and would see that there was a transaction could

15     categorize it appropriately.  Mr. Saunders was in

16     there categorizing transactions all the time.

17     Within the savings and checking account was all of

18     the deposits that he cashed and he deposited.

19     That's the same place that my loan payment would

20     have shown up so he could have categorized it at the

21     exact same time.

179: 1     Q.    So during the time you were at Beacon

2      Scientific do you recall Mr. Saunders ever

3      categorizing any of your loan repayments in Quick

4      Books?

5          A.    I don't recall one way or the other who

6      categorized the payments.  But the payments were

7      there to be seen.  Mr. Saunders most definitely saw

8      them.  Whether he categorized them or not, I don't

9      know.

10         Q.    And, again, did you on any quarterly or

11     annual basis go through and make sure that your loan

12     repayments were properly categorized.  Or is that

13     not part of your responsibilities?

14         A.    My personal responsibility to pay the loan

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
15    back.

16         Q.   Yes.
```

**Note:** Designation

**Pg: 195 Ln: 8 - Pg: 197 Ln: 7**

**Annotation:**

```
195: 8  Q.   All right.  And it looks like as part of

     9   this asset purchase agreement, Exhibit A is a

    10   promissory note?

    11        A.   Yes.

    12        Q.   And then it looks like after that Exhibit

    13   B is also a bill of sale?

    14        A.   Correct.

    15        Q.   And it looks like the promissory note, the

    16   asset purchase agreement between Beacon and Saunders

    17   Engineering was for 383,000?

    18        A.   Yes.

    19        Q.   As of this date, January 1st, 2018.

    20   First, can you explain to me what the purpose of the

    21   asset purchase agreement was and the note and the

196: 1   bill of sale.  Do you know?

     2        A.   Sure.  The original operating agreement

     3   had, as we looked at with the compensation clause

     4   5.1, I believe, allowed Mr. Saunders to pull out as

     5   additional salary the equivalent to the $400,000 of

     6   my loan.  It was originally envisioned by

     7   Mr. Saunders that he would not pull out that money

     8   until future dates at which time his tax rate would
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
      9    theoretically be lower.  It became necessary for

     10    whatever reason for Mr. Saunders to start to take

     11    withdrawals against that 400,000 earlier in the

     12    process.  And upon taking the first withdrawal of

     13    $17,000, he recognized, A, his -- he was being taxed

     14    at salary as income and there were payroll taxes

     15    involved with making the distributions in that

     16    manner.  Ms. Feinman and Mr. Saunders realized that

     17    it would be more advantageous to have structured the

     18    original agreement that instead of giving

     19    Mr. Saunders an additional $400,000 in salary to

     20    have it as an asset purchase from Beacon Scientific

     21    from Saunders Engineering Consulting.  So we had

197: 1    Mr. Rife draft an asset purchase agreement and a

      2    revision amendment to the operating agreement.  And

      3    post -- or back dated those to January 1st.  So it

      4    says 383,000 because the 17,000 was transferred in

      5    2017.  But the plan was to, I will call it,

      6    reclassify all the extra cash that he took out of

      7    the company post January 1, 2018.
```

**Note:** Designation

**Pg: 202 Ln: 6 - Pg: 203 Ln: 2**

**Annotation:**

```
202: 6    Q.   Yes.  Do you recall -- do you recall any

      7    of those amounts or how much prior to -- prior to

      8    your termination from Beacon?

      9         A.   I'm sure the records have it more precise.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
     10    But I believe it was close to $100,000 but maybe

     11    slightly below.

     12        Q.   Did Mr. Saunders ever explain to you that

     13    he needed to take those withdrawals towards sort of

     14    his loan amount that he may need for his family or

     15    tuition or whatever.  Did you ever have any

     16    conversations like that?

     17        A.   Primarily he made withdrawals against the

     18    400,000 to pay tuition for his kids' private

     19    education.

     20        Q.   Okay.  And, again, you didn't have an

     21    issue or objection to any of that; is that correct?

203: 1        A.   No, I was trying to be considerate of his

      2    needs.
```

**Note:** Designation

**Pg: 206 Ln: 12 - Pg: 208 Ln: 10**

**Annotation:**

```
206:12  Q.   Okay.  Around January 2020 do you ever

     13    recall having any discussions with Mr. Saunders

     14    about any sort of conduct during a work trip in

     15    Indianapolis, Indiana for an archery trade

     16    association trade show?

     17        A.   I attended an archery trade association

     18    trade show.

     19        Q.   Do you recall ever having discussions with

     20    Mr. Saunders about any of your sort of personal

     21    conduct with other individuals while you attended
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

207: 1    that conference?

2              MR. WHITWORTH:  Objection.  Relevance.

3         A.   Yes.

4         Q.   Okay.  Do you recall when that trade show

5    took place?

6         A.   Early January 2020.

7         Q.   January 9th and 10th?

8         A.   Sure.

9         Q.   2020, does that sounded accurate.  Can

10   you -- what do you recall of those discussions

11   between you and Mr. Saunders about?

12        A.   It wasn't a discussion.  I just informed

13   him that one night I was hit on by one of the

14   clients.

15        Q.   Okay.  And was that a -- was the client a

16   woman who was president of Primal Vantage Company?

17             MR. WHITWORTH:  Objection.  Relevance.

18        A.   Yes.

19        Q.   And were you at a strip club called Red

20   Garder Gentleman's Club?

21        A.   I have the slightest idea what the name of

208: 1    the club was.

2         Q.   And were there others other than you and

3    the president of this company, were there other

4    attorneys and others that also attended?

5         A.   Yes.  Our biggest client had five

6    attorneys that are the ones that took me there.

7         Q.   You all went to dinner first and --

8         A.   That's correct.

9         Q.   -- then went to this club?

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
10          A.   Yeah.
```

**Note:** Designation

**Pg: 213 Ln: 19 - Pg: 214 Ln: 7**

**Annotation:**

```
213:19   Q.   Okay.  Then after you received this
   20    spreadsheet in Exhibit 26, did you have any
   21    conversations specifically with Mr. Saunders about
214: 1   this spreadsheet on the -- that you got on the 26th?
    2         A.   Well, there were several interactions
    3    between -- or there's at least an e-mail from me
    4    after the conversation and prior to this
    5    spreadsheet.  There were no conversations because
    6    Mr. Saunders seemed to want to do everything through
    7    written record.
```

**Note:** Designation

**Pg: 215 Ln: 19 - Pg: 216 Ln: 10**

**Annotation:**

```
215:19   Q.   The analysis you did, we attached that, it
   20    looks like as 27A.  There should be, looks like
   21    again, an excel spreadsheet that you had put
216: 1   together?
    2         A.   That's correct.
    3         Q.   Does that look accurate?
    4         A.   Yes.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 5          Q.   Okay.  And then -- at some point do you
 6      all actually meet face to face and have a discussion
 7      about these different spreadsheets or do the e-mails
 8      keep going back and forth?
 9          A.   There was essentially no verbal
10      discussions and there was no face to face.
```

**Note:** Designation

**Pg: 220 Ln: 7 - Pg: 221 Ln: 19**

**Annotation:**

```
220: 7  Q.  All right.  But -- what did you understand
     8      at this time that he was complaining about.  Did
     9      you --
    10          A.  His personal income level.
    11          Q.  Okay.  And what did -- did you get an
    12      understanding of why he was complaining about his
    13      personal income level?
    14          A.  Well, I think he felt that he used to be
    15      making more money than what he was making as part of
    16      Beacon Scientific and he felt like that wasn't
    17      working for him any more.
    18          Q.  Do you recall Mr. Saunders complaining to
    19      you that he felt you were not sort of pulling your
    20      weight as a 49 percent owner of the company to the
    21      bottom line revenues of the company?
221: 1          A.  I recall him complaining in this e-mail
     2      about that and I vehemently disagree.
     3          Q.   And do you believe you were contributing
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 4    essentially in an equal amount to the bottom line

 5    profit and revenues of the company as Mr. Saunders

 6    was?

 7          A.   Yes.

 8          Q.   Okay.  And what is that based on?

 9          A.   My contribution to the company was not to

10    be solely a forensic engineer.  My job was to run

11    the company, and the company's performance was

12    excellent.  To me it was a team based approach.  We

13    were working very well as a team.  When Mr. Saunders

14    needed help on a case, I made sure that he got the

15    help that he needed to make sure the clients were

16    served.  If Mr. Bochicchio needed help on a case, I

17    made sure that he got what he deserved.

18    Mr. Saunders can stare at me and try to make me

19    intimidated, but I don't appreciate it.
```

**Note:** Designation

**Pg: 221 Ln: 20 - Pg: 223 Ln: 9**

**Annotation:**

```
221:20  Q.   Did you look at -- I guess go back to

    21    Exhibit 26A.  That this analysis that Mr. Saunders

222: 1    did was trying to analyze the, I guess, the billable

     2    income that you generated for Beacon Scientific.  Is

     3    that fair to say.  Go back to 26A?

     4          A.   Yes, he was analyzing billable income.

     5          Q.   Okay.  And he was also looking at -- so we

     6    look at that spreadsheet.  He was also looking at,
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 7      you know, payroll distribution.  So what, you know,

 8      what you and Mr. Saunders were actually paid through

 9      both salary and distributions.  And then he was

10      looking at gross income generated.  And then he was

11      trying to make sort of a comparison that as far as

12      how sort of profitable you all were.  Did you

13      understand the point he was trying to make with

14      regard to the, again, the income you generated and

15      the costs -- your costs to the company?

16              MR. WHITWORTH:  Objection.  Form.

17          A.  I understood the analysis that he

18      performed.  I disagree with the conclusion that he

19      draw from this analysis.

20          Q.  All right.  So again in -- I just want to

21      be clear on this.  The numbers are what they are.

223: 1   You don't dispute the actual numbers in the

 2      analysis?

 3              MR. WHITWORTH:  Objection.

 4          A.   I never verified then that they are

 5      accurate.  But I'm not disputing that they are

 6      inaccurate.  I never went back and re-ran the

 7      numbers to make sure that he did the analysis

 8      correctly, but I don't have any reason to doubt

 9      them.
```

**Note:** Designation

**Pg: 223 Ln: 10 - 18**

**Annotation:**

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
223:10   Q.   But at the time you got this, I mean did

    11   it make you want to go back and look at the income

    12   and expenses on, you know, you in particular to sort

    13   of check and see if any of this was accurate.  Or

    14   did you trust that, hey, these numbers were pulled

    15   from your database and that they appeared accurate?

    16          MR. WHITWORTH:  Objection.  Asked and

    17       answered.

    18       A.   The numbers did not surprise me.
```

**Note:** Designation

**Pg: 232 Ln: 3 - Pg: 234 Ln: 2**

**Annotation:**

```
232: 3   Q.   So the books and records, again, this

     4   would have been part of your responsibility for

     5   maintaining those financials?

     6          MR. WHITWORTH:  Objection.

     7       A.   I wouldn't say -- sorry.

     8       Q.   Was that part --

     9       A.   I would not say that there were books and

    10   records that were kept other than printing out

    11   profit and loss and balance sheets at the end of the

    12   year, which were printed out in both manners.  The

    13   taxes were done on a cash basis.

    14       Q.   Maybe I asked that the wrong way.  Were

    15   you responsible for maintaining the financial

    16   records in Quick Books for Beacon Scientific?

    17          MR. WHITWORTH:  Objection.  Asked and
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

18    answered.

19    A.   We have talked about who did the Quick

20    Book entries.  It was a combination of both of us.

21    Q.   But the responsibility of putting profit

233: 1    and loss statements either on a monthly basis or

2    quarterly basis or annual basis and working with the

3    accountant, Ms. Feinman, as far as potentially

4    putting the taxes together, who did -- who was

5    responsible for doing that?

6    A.   Profit and loss statements, balance

7    sheets, are a click of a button in Quick Books from

8    either a cash or accrual basis.  Mr. Saunders knows

9    how to do it, I knew how to do it, Ms. Feinman could

10    do it.  We didn't look at them regularly because we

11    had no reason to.  Ms. Feinman would pull all the

12    data directly off of the Quick Books to run taxes,

13    to prepare the tax returns.

14    Q.   Okay.

15    A.   So I did not have to provide her anything

16    to do the tax returns.

17    Q.   All right.  Did you all, and again while

18    you were manager of the company, did you all have

19    any sort of regular -- regular or irregular times

20    that you would meet and print out profit and loss

21    statements and sit down and look at that and discuss

234: 1    the finances of the company?

2    A.   Nope.

**Note:** Designation

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION


**Pg: 244 Ln: 19 - Pg: 246 Ln: 5**

**Annotation:**

244:19   Q.   Okay.  But did you understand Mr. Saunders
     20   was trying to get the point across that as far as
     21   new clients or new matters that, again, over the
245: 1   period of your, you know, founding the company, that
      2   again according to him you only brought in ten new
      3   clients.  Is that correct or not correct?
      4        MR. WHITWORTH:  Objection to the form of
      5     the question.
      6        A.   I think that's his analysis and I disagree
      7   with his analysis.
      8        Q.   Okay.  So if we look -- meaning you did
      9   not or did not bring in ten new clients over three
     10   years?
     11        MR. WHITWORTH:  Objection.  Form.
     12        A.   I disagree that I brought in ten clients.
     13   I contributed to the work that Mr. Saunders was
     14   doing which led to additional referrals and new
     15   clients.  You can't separate out his clients versus
     16   my clients once we are a team as Beacon.
     17        Q.   Okay.
     18        A.   They are Beacon clients.
     19        Q.   All right.  So when Mr. Saunders says he
     20   brought in 53 additional clients over three years,
     21   again, your position on that is those 53 additional
246: 1   clients are also your clients?
      2        A.   They are Beacon clients.  Mr. Saunders
      3   brought in the clients that he brought in whenever I

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
    4    bought into the company.  Anything after that was a
    5    Beacon client.
```

**Note:** Designation

**Pg: 246 Ln: 6 - Pg: 248 Ln: 2**

**Annotation:**

```
246: 6   Q.   And we looked at the operating agreement
     7    earlier.  If you or Mr. Saunders leaves Beacon
     8    Scientific, there is no non-compete?
     9        A.   Correct.
    10        Q.   And so when -- if Mr. Saunders, and he
    11    says this on this same page if you look at the
    12    e-mail toward the bottom, he says, "I don't think
    13    the scenario where I leave the company and start a
    14    new company would leave Beacon Scientific in a very
    15    good way and by extension you financially."  Would
    16    you agree?
    17            MR. WHITWORTH:  Objection to the question.
    18        A.   That's what it says.
    19        Q.   I know.  But would you agree with that
    20    statement?
    21        A.   I think it's a threat that I really don't
247: 1    necessarily agree with.  Because it's exactly what
     2    he did to me when he declared default and I had to
     3    go out on my own with essentially none of Beacon
     4    Scientific clients.
     5        Q.   Let me ask you about that.  Why is that.
     6    Because you were free to compete when you left, and
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 7        we will talk more about that.  Any of Beacon

 8        Scientific's clients, right, could follow you to

 9        Aither; is that correct?

10             A.   They could have.

11             Q.   And I know we'll get to this, but some

12        did?

13             A.   A few.

14             Q.   Okay.  And, again, the point Mr. Saunders

15        was making at this point is if Mr. Saunders left the

16        company, that at least his assertion was that his

17        clients, many of which he had worked with for many,

18        many years, would follow him.  Do you agree with

19        that?

20             A.   I agree with that, most of them would have

21        followed him.  But I disagree that it would have not

248: 1    left Beacon Scientific and me in good shape

 2        financially.
```

**Note:** Designation

**Pg: 267 Ln: 4 - 15**

**Annotation:**

```
267: 4    Q.   Over the two and a half years did you have

 5        any discussions with Mr. Saunders about any

 6        interpretation of the loan agreement?

 7             A.   There would be no reason to have

 8        discussion about something that we all felt had the

 9        same interpretation.  But he was well aware of what

10        I paid back.  My payment history.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
11          Q.   But my question was did you have any

12     discussions over interpretations of the loan

13     agreement in any of the time from the formation of

14     the company to May 8, 2020?

15          A.   No.
```

**Note:** Designation

**Pg: 269 Ln: 14 - Pg: 271 Ln: 6**

**Annotation:**

```
269:14  Q.  Correct.  You are now hearing -- is it

   15     fair to say are you hearing for the first time from

   16     Mr. Saunders on May 8, 2020 as to his reading or

   17     understanding of section three of the loan

   18     agreement?

   19          A.   Yes.  And the first time that I heard of

   20     any delinquency or default in the loan at all.

   21          Q.   All right.  And, again, it looks like on

270: 1     that first page Mr. Saunders did an analysis where

    2     he took the $85,000 that you had paid in and then he

    3     had calculated 50 percent of the distributions you

    4     had received since 2017, which it looks like were

    5     188,500 -- sorry, 353.33.  Subtracts those and

    6     states that you were in default $103,353.33.  Do you

    7     see that?

    8          A.   That's what he says.

    9          Q.   All right.  And then he attached the loan

   10     agreement again to his e-mail.  Do you then have a

   11     discussion with Mr. Saunders about once you received
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
12    this or what do you do after that?
13         A.   Well, we had a conversation when we were
14    supposed to talk about the business plan when he
15    told me this, he followed up that conversation with
16    this, with the e-mails.  So the e-mails came after
17    the conversation.
18         Q.   Okay.  During the phone call did you
19    understand what he meant by the default.  Did he
20    explain his understanding of the loan agreement?
21         A.   He told me the loan agreement said
271: 1    something different than what I expected and to go
 2    look at it carefully because that's what I -- my
 3    understanding of it is not what he thinks it said.
 4    So he instructed me to go back to the loan agreement
 5    because it said something different than our
 6    understanding.
```

**Note:** Designation

**Pg: 274 Ln: 15 - Pg: 275 Ln: 3**

**Annotation:**

```
274:15    Q.   Did you at some point have a conversation
16    with Mr. Rife where you said to him that you screwed
17    him?
18         A.   Yeah, I didn't use that word.  But when he
19    told me that, you know, he was agreeing with
20    George's interpretation, then I told him that he
21    screwed me.
275: 1    Q.   Okay.  Did you tell him at that point that
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
     2     you believed he made a mistake as counsel?

     3          A.   Yes, I did.
```

**Note:** Designation

**Pg: 281 Ln: 8 - Pg: 282 Ln: 20**

**Annotation:**

```
281: 8   Q.   Okay.  All right.  Then looking at

     9     Exhibit 37, I know we looked at this document

    10     earlier just to look at some of the attachments, but

    11     this looks like a letter from Mr. Saunders to you

    12     dated May 8, 2020.  Did you receive this

    13     correspondence from Mr. Saunders?

    14          A.   Yes, he e-mailed it on May 8 and followed

    15     up with a certified letter.

    16          Q.   In the last -- in the last paragraph on

    17     the second page, starting with the second sentence,

    18     it says, "the company has the options of allowing

    19     you to retain a member of the company with

    20     10.4 percent ownership per the attached analysis in

    21     terms of the agreements or terminating your

282: 1     membership interest and paying you 42,500 or 50

     2     percent of the loan payments received to date.

     3     These are the options available to the company but

     4     the ultimate decision is being left to you."  Did

     5     you -- did you respond to that?

     6          A.   Shortly after receiving the default notice

     7     Ms. Feinman attempted to mediate between the two of

     8     us.  When that mediation failed, I responded.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 9          Q.   Okay.  Responded by again -- and we'll
10     look at it, I think we have your e-mail here, but
11     denying that there was any default?
12          A.   That's correct.
13          Q.   Correct.  Therefore you weren't going to
14     take either option because you don't believe you
15     defaulted under, again, your understanding of the
16     loan agreement?
17          A.   Yes, that's correct.
18          Q.   And it looks like Mr. Saunders was
19     requesting a reply by May 18th, 2020?
20          A.   That's what it says.
```

**Note:** Designation

**Pg: 293 Ln: 16 - Pg: 294 Ln: 11**

**Annotation:**

```
293:16  Q.   Okay.  Looking at Exhibit 50, again, an
    17     e-mail from you to Mr. Saunders dated May 17th,
    18     2020.  And this is the e-mail where you deny there
    19     was any default?
    20          A.   Correct.
    21          Q.   Correct.  And at what point did you retain
294: 1     Mr. Whitworth or his firm.  I'm not asking about
     2     communications, just the date you retained him?
     3          A.   Sorry.  Flip back.  So on the evening of
     4     May 14th is when I received George's responses in
     5     blue.  So May 15th is when I would have retained --
     6     maybe the 16th.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 7        Q.   Okay.  Sometime prior to this e-mail dated

 8    May 17, 2020, which is --

 9        A.   Yes.

10        Q.   -- exhibit 50?

11        A.   Yes.
```

**Note:** Designation

**Pg: 295 Ln: 6 - 13**

**Annotation:**

```
295: 6   Q.   If you look at Exhibit 52 on May 18th an

      7   e-mail from Mr. Saunders, he's e-mailing Mr. Rife

      8   and copying you.  He says "based on Doctor Kiddy's

      9   e-mail below", from May 17th, "please hold of on

     10   executing default per the Kiddy loan."  Do you see

     11   that?

     12       A.   I see that.  I'm not entirely sure what he

     13   means.  But I see that's what he said.
```

**Note:** Designation

**Pg: 296 Ln: 9 - Pg: 299 Ln: 12**

**Annotation:**

```
296: 9   Q.   When you look at Exhibit 54, this is a

     10   letter from Mr. Saunders to you dated June 16, 2020.

     11   Do you recall receiving this letter saying

     12   "reference Kiddy loan event of default

     13   notification"?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

14      A.   Yes.

15      Q.   And attached to that there looks like

16   there's an appointment of management committee

17   member where Mr. Saunders is appointing Roger Link

18   as a member of the management committee.  Do you see

19   that?

20      A.   I see that.

21      Q.   And then there is also a written consent

297: 1   of management committee which also appears to be

2   signed by Mr. Saunders and Mr. Link.  Do you recall

3   receiving that as well with the letter?

4      A.   Yes.

5      Q.   And was -- the check -- I'm sorry, the

6   letter also references a check to you in the amount

7   of 42,500 for 50 percent of the loan payments

8   received by the company to date from you.  Was there

9   a check also enclosed with the letter?

10      A.   There was a check enclosed.

11      Q.   All right.  Did you understand pursuant to

12   both the cover letter and the resolution that this

13   was formal notice that the company at this point was

14   terminating your membership interest in the company

15   as well as you as an employee of the company?

16      A.   Yes.

17      Q.   All right.  Again, leaving aside the

18   interpretation of the loan agreement for a second,

19   as far as the appointment of Mr. Link and the

20   management committee, did you have any, again,

21   issues with that.  I'm not -- I understand you have

298: 1   issues with the underlying default, but as far as

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

2    Mr. Saunders contacting and appointing Mr. Link as

3    part of the management committee, any issue there?

4         MR. WHITWORTH:  Objection to form.

5         A.   I had issues in that Mr. Saunders had

6    already unilaterally taken action to declare the

7    default and to take action in reference to the

8    default on May 8th.  And there was essentially

9    nothing different other than to try to clean up his

10   mistake by appointing Mr. Link and then coming up

11   with a resolution and a new letter.  But essentially

12   everything that -- the default was declared a month

13   earlier, so to me this was not -- not all that

14   different I guess.

15        Q.   But the default being declared on May 8,

16   2020, you weren't terminated at that point, correct?

17        A.   George took actions against me.  I was not

18   terminated, I was still a member.  But I was no

19   longer a management committee member, I was no

20   longer engaged in the day-to-day activity.

21   Mr. Saunders cut off my access from various company

299: 1   systems long before this default notice, the second

2    default notice.

3         Q.   All right.  When was your last paycheck

4    for salary from Beacon Scientific, do you recall?

5         A.   Whatever the date is on this, June 19th.

6         Q.   Around June 19th of 2020.  It's referenced

7    in the letter that you were paid through June 19,

8    2020?

9         A.   Yes.

10        Q.   And how about as far as your distributions

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
11    through June of 2020?
12         A.   Correct.
```

**Note:** Designation

**Pg: 315 Ln: 8 - Pg: 317 Ln: 8**

**Annotation:**

```
315: 8    Q.   Did you send any solicitations to any
      9    Beacon Scientific customers after you were
     10    terminated?
     11         A.   I notified a number of customers that I
     12    was no longer with Beacon and provided them with my
     13    new contact information.
     14         Q.   All right.  Going back to the Dropbox for
     15    a moment.  Had you made or downloaded any of those
     16    Beacon files to any of your electronic devices?
     17         A.   Earlier, when we began negotiations and
     18    Mr. Saunders started cutting me off of access from
     19    various systems, I downloaded files for the active
     20    cases that I was working on so I can make sure I
     21    would have access to those files.  And subsequently
316: 1    deleted them later, prior to June 19th.  I also at
      2    some point downloaded some of the corporate
      3    documents, operating agreement, loan agreement,
      4    those type of things, that I did not have individual
      5    copies of but I had prior some of those.
      6         Q.   As far as any customers of Beacon
      7    Scientific that you contacted, how is it that you
      8    had their contact information?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
 9          A.   Publicly available on web sites.  I knew
10    who they were, I knew where they worked, it was easy
11    to look them up.
12          Q.   Can you approximate how many customers or
13    clients of Beacon Scientific you contacted or
14    communicated with after you left?
15          A.   I produced the e-mails.  For all of them,
16    it's 20.  It's an approximation.  I don't remember
17    that number.
18          Q.   And did you actually call any of those
19    Beacon customers as well and let them know that you
20    had started -- that you had started Aither?
21          A.   There were some phone calls but not many.
317: 1    Surely not as many.
 2          Q.   Okay.  Did any Beacon customers follow you
 3    to Aither and engage you as part of Aither?
 4          A.   There was a series of active matters that
 5    the clients chose to continue to use me as their
 6    expert and hence followed me to Aither.  There is a
 7    couple of clients who have given me additional work
 8    post Beacon.
```

**Note:** Designation

**Pg: 333 Ln: 6 - Pg: 334 Ln: 2**

**Annotation:**

```
333: 6    Q.   All right.  And, again, my question to you
 7    is as you sit here, what facts do you have to
 8    support any fraud claim against Mr. Saunders?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

```
  9              MR. WHITWORTH:  Objection.
 10         A.   Give me a minute to read the section of
 11    the complaint here.  Well, I'm not going to attempt
 12    to apply a legal definition, but Mr. Saunders was
 13    completely aware that the terms of the default --
 14    sorry, terms of the loan agreement were as intended
 15    and when he couldn't get me to buy out at his
 16    outrageous low valuation, he started looking for
 17    another way to disassociate me.  And he is purposely
 18    misrepresenting his understanding of the loan
 19    agreement to declare default.  He's doing that for
 20    his interest.  It's not in the best interest of the
 21    company.  And surely wasn't in, you know, given in
334: 1    good faith to myself as not only a member but
  2    somebody he should have cared about.
```

**Note:** Designation


**Pg: 335 Ln: 3 - Pg: 336 Ln: 7**

**Annotation:**

```
335: 3    Q.   So anything else, Doctor Kiddy, that --
  4    facts that support your contention of fraud against
  5    Mr. Saunders?
  6              MR. WHITWORTH:  Same objection.  Same
  7         incorporation.
  8         A.   There's a thousand pages here.  There is
  9    70,000 pages that your client produced.  You're
 10    asking me after seven hours of deposition what all
 11    the facts are to justify Mr. Saunders' outrageous
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [9/1/2021] Kiddy Deposition 9.1.21 – DEFENDANT'S DESIGNATION

        12     behavior.  We could be here for a few more if that's

        13     what you would like to do.

        14          Q.   Anything specific.  This is your

        15     opportunity before trial to tell me all the facts

        16     you're going to testify at trial to support your

        17     claim of fraud?

        18               MR. WHITWORTH:  Same objection.

        19          Q.   This is your opportunity.

        20               MR. WHITWORTH:  Same incorporation.  Asked

        21     and answered.  I'm going to instruct you not to

   336: 1     answer the question.

         2               MR. KAGAN:  You're going to instruct his

         3     not to answer the question --

         4               MR. WHITWORTH:  Because he already

         5     answered it.

         6               MR. KAGAN:  -- for his basis of fraud.

         7               MR. WHITWORTH:  Yeah.


**Note:** Designation