**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

Pg: 38 Ln: 19 - Pg: 42 Ln: 20

**Annotation:**

| | |
|---|---|
| 38:19 | So Exhibit 1 is an e-mail from you to |
| 20 | Mr. Saunders dated March 12, 2017 and it -- the |
| 21 | subject is "Cash Flow."  Is that what you're looking |
| 39: 1 | at? |
| 2 | A    Yes. |
| 3 | Q    Okay.  And what was the purpose of this |
| 4 | e-mail? |
| 5 | A    Well, when you startup a new company, |
| 6 | there's cash flow issues.  You sort of immediately |
| 7 | have expenses.  You have to pay people.  You have to |
| 8 | pay for things, but you don't get paid right away. |
| 9 | You have to do work.  You have to send |
| 10 | out invoices.  You have to get paid.  So there's a |
| 11 | period there where cash is tight really when you |
| 12 | start up with almost any company unless you have |
| 13 | some large infusion of cash.  This was an analysis I |
| 14 | did to look at how we were going to get through that |
| 15 | first period with respect to cash flow. |
| 16 | Q    If you look at bullet point No. 1, it |
| 17 | says, "I set both of our salaries at 250,000" -- it |
| 18 | actually says "250K." |
| 19 | A    Yes. |
| 20 | Q    Okay.  That means 250,000? |
| 21 | A    It does. |
| 40: 1 | Q    Did you have any discussions with |
| 2 | Mr. Saunders about the compensation that each of you |
| 3 | would receive? |

**EXHIBIT**

**B**

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

    4        A     The conversation was that he was making
    5    more money than I was going into this.  And so, if
    6    he had a salary number or a compensation number that
    7    suited his needs, it would be fine with me.  It
    8    wasn't set at this point in time.  This was just a
    9    ballpark as to what I thought that might be when I
   10    did this analysis.
   11        Q     Bullet point No. 2 says, "I have a
   12    salary ramp up go as 25% percent, 50%, 50%, 75% 100%
   13    over the first several months."
   14              To what were you referring there and
   15    what was the reason for that?
   16        A     Yeah.  Again, we would be paying
   17    ourselves a salary, but we would not have the cash
   18    to pay ourselves a full salary.  That was offset
   19    from the fact that he would have money still coming
   20    in from Saunders Engineering Consulting.  I'd have a
   21    severance package -- or not a severance package, but
41: 1    a vacation drawdown period with Weatherford and that
    2    would allow me to not make a full salary for some
    3    period of time.
    4              So, basically, while those two things
    5    are being drawn down, his accounts receivable, my
    6    vacation, the new company is going to start paying
    7    us more during that period of time, and then,
    8    hopefully, after, you know, five months, we have
    9    enough receipts coming in that we can just afford to
   10    pay ourselves.
   11        Q     The next bullet point No. 3 says, "I

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    12      assumed you were billing at a rate of 2,000 hours a

    13      year (167 hours per month) and I billed at a

    14      thousand hours a year (83 hours per month).

    15              To what were you referring there?

    16      A     Yeah.  So the -- you know -- the general

    17      arrangement was that Mr. Saunders was going to be a

    18      full-time practicing forensic engineer like he was,

    19      and I was going to be running, growing and managing

    20      the company, but recognizing that as a two-person

    21      company, you know, I had to earn my keep.

42: 1               So I put my billable hours at, you know,

     2      about thousand per year, about half time, and his

     3      at, you know, 2,000 a year, which is basically full

     4      time, as an assumption as to what I could do while

     5      doing the other responsibilities.

     6      Q     And did you have discussions with

     7      Mr. Saunders about those assumptions and

     8      expectations?

     9      A     We had discussions about what the roles

    10      would be.

    11      Q     As well as what the expected hours

    12      annual billing should be?

    13      A     I think we talked about the general idea

    14      of, you know, I would be spending part of my time

    15      doing other work.  I think this is probably the

    16      first time where there numbers were put down related

    17      to that.

    18      Q     Did Mr. Saunders object to these numbers

    19      when you sent this e-mail?
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     20              A    No.
```

**Note:** OBJECTION RELEVANCE

**Pg: 44 Ln: 8 - Pg: 47 Ln: 17**

**Annotation:**

```
 44: 8    Q    If you'll turn to the second page of
      9         Exhibit 1, you'll see a printout of a spreadsheet
     10         that was attached to your exhibit.  At the top of
     11         this, it says, "Salaried Employees."
     12              Do you see that?
     13         A    Yes.
     14         Q    And this was reflecting the $250,000
     15         hypothetical base salary?
     16         A    It does.
     17         Q    And then can you identify the second --
     18         the next page, third page of the exhibit, second
     19         page of the attachment, what's this?
     20         A    This is a spreadsheet that was done in
     21         Excel.  Basically looking at what the cash flow is,
 45: 1         what is the cash in the company.
      2              So, at the top left, it starts with an
      3         initial investment of $50,000 and then it goes
      4         through the first six months looking at how much
      5         we're going to pay in expenses; how much we're going
      6         to pay in salary.
      7              Basically, doing it so that we have cash
      8         on hand at the end of each month until we get to the
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 9        point, you know, near the end there where we're
10        starting to grow our cash balance and -- and be a
11        little more stable.
12                There's -- sorry.  There's a number of
13        highlighted sections which were basically
14        assumptions.  So variables that could be changed to,
15        you know, play around with these numbers and make
16        adjustments as needed.
17        Q    So when you sent this to Mr. Saunders,
18        it was for discussion purposes, is that correct?
19        A    It was to show that if we follow this
20        plan that we would be able to follow the first, you
21        know, six months or so of operation from a cash
46: 1     standpoint; how we can manage the first six months.
 2        Q    On the right-hand side at the top of the
 3        spreadsheet, to the right of the words "Amount
 4        billed 70,000," there's a parenthetical, it says,
 5        "George full-time billable, Jason one half
 6        billable."
 7                To what does that refer?
 8        A    That refers to the assumption that I
 9        made -- or that I at least mentioned in the e-mail
10        before where George would be basically billing the
11        2,000 hours a year, which is full-time work, and I
12        will be billing a thousand hours per year, which is
13        basically half time.
14        Q    And did Mr. Saunders ever comment on
15        this spreadsheet in writing, send it back to you,
16        change any of the variables?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    17          A    No.

    18          Q    At the top left-hand corner of the

    19     spreadsheet, it has the reference that you just

    20     testified about the initial investment of 50,000.

    21               Did you have conversations with

  47: 1     Mr. Saunders about that number?

     2          A    Yes.

     3          Q    And tell us about that please.

     4          A    I agreed that as -- as part of my

     5     investment into the new company that I would

     6     contribute $50,000 at startup to address this cash

     7     flow issue.

     8          Q    So when you prepared this analysis that

     9     50,000 initial investment at that time was

    10     referencing 50,000 that you had intended to

    11     contribute personally?

    12          A    Yes.

    13          Q    Okay.  And you had conversations with

    14     Mr. Saunders about that?

    15          A    I'm sure we did.

    16          Q    How you doing?

    17          A    I'm okay.
```

**Note:** OBECTION RELEVANCE

**Pg: 49 Ln: 2 - Pg: 65 Ln: 1**

**Annotation:**

```
  49: 2   Q    I'd ask you to turn to Exhibit Tab 2.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 3        This is an e-mail string that begins by and between

 4        Mr. Rife and you and Mr. Saunders.  The first of

 5        which is dated March 28, 2017 at 2:47 p.m.

 6             Do you see that?

 7        A    Yes.

 8        Q    Okay.  Did I properly identify that?

 9        A    Yes.

10        Q    Okay.  I'm going to ask you like all

11        e-mail strings they start at the back and go

12        forward.  So I'm going to ask you to go to the

13        second page and you'll see at the bottom there's an

14        e-mail that it begins this string from Mr. Saunders

15        to Mr. Rife and to you, dated March 10, 2017 at 9:07

16        a.m.

17             Do you see that?

18        A    I do.

19        Q    And did you receive that e-mail?

20        A    Yes, I did.

21        Q    Okay.  Can you identify --
```

```
50: 1        MR. KAGAN:  Sorry to interrupt.  I'll

 2        just start an objection on the record, again, based

 3        on our preliminary objection -- objection and just

 4        ask for an ongoing objection with regard to, again,

 5        parole evidence related to the eventual

 6        agreements -- (inaudible) --

 7             MR. WHITWORTH:  Okay.  We'll recognize

 8        that continuing objection.  Thank you, Jonathan.

 9        Q    You received this e-mail string?

10        A    Yes.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
11          Q      And what was the purpose of the -- of

12      this -- these communications?

13          A      We were beginning our discussions with

14      -- with Mr. Rife to start to setup the company and

15      create the operating agreement for the company.

16          Q      And was there a formal engagement

17      agreement that you entered into with Mr. Rife?

18          A      It was not.

19          Q      Like, a written document?

20          A      No.

21          Q      Who did you understand Mr. Rife

51: 1      represented?

2          A      Mr. Saunders and I.

3          Q      And at the time, was Be -- was the

4      company even in formation?

5          A      Company didn't exist yet, right.  I

6      mean, we were talking about a theoretical entity at

7      the time.

8          Q      And throughout this period of time, was

9      Mr. Rife providing advice to you and Mr. Saunders

10      relative to the formation of the company?

11          A      Yes, he was.

12          Q      At any time did he advise you about any

13      potential conflicts of interest?

14          A      No, he did not.

15          Q      At any time did he specifically advise

16      either you or Mr. Saunders to get separate or

17      independent counsel?

18          A      Not that I'm aware of.  He did not to
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

|   |   |
|---|---|
| 19 | me, and I'm not aware to Mr. Saunders. |
| 20 | Q    Did you understand that Mr. Rife was |
| 21 | your attorney with respect to the drafting of these |
| 52: 1 | documents? |
| 2 | A    Yes. |
| 3 | Q    Did you rely on Mr. Rife's advice and |
| 4 | opinion, his role as an attorney? |
| 5 | A    Yes. |
| 6 | Q    And did you understand that he |
| 7 | understood you were relying on his advice? |
| 8 | A    Yes. |
| 9 | MR. KAGAN:  Objection, move to strike. |
| 10 | Q    Ms. Feinman, what would you understand |
| 11 | -- who did you understand she was providing advice |
| 12 | to? |
| 13 | A    Mr. Saunders and I.  More directly to |
| 14 | Britt, probably, but to all of us -- |
| 15 | Q    Okay. |
| 16 | A    But on behalf of Mr. Saunders and I. |
| 17 | Q    And did you rely upon the advice and |
| 18 | recommendations that Ms. Feinman provided? |
| 19 | A    Yes. |
| 20 | Q    Tell us what conversations did you have |
| 21 | with Mr. Saunders and Mr. Rife relative to how to |
| 53: 1 | structure your ownership interest in this company. |
| 2 | A    Well, we had a meeting at Mr. Rife's |
| 3 | office where we first discussed sort of the basic |
| 4 | objectives of all we were trying to accomplish.  You |
| 5 | know, we were recommended at that time to create an |

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
      6    LLC.

      7           My experience had been with C

      8    corporations.  So that's sort of what I went in as

      9    expecting, but he explained the benefits of an LLC.

     10    So he made that recommendation.

     11           We knew we wanted to be, you know,

     12    essentially, equal partners and we discussed how to

     13    do that; how to handle my investment into the

     14    company in exchange for, you know, the goodwill that

     15    George would be bringing in from Saunders and how to

     16    structure those arrangements and how Mr. Saunders

     17    would recoup the -- my investment to compensate him

     18    for the goodwill.

     19      Q    And when you say that it was discussed

     20    that Mr. Saunders would bring the goodwill of

     21    Saunders Engineering Consultants, what does that

 54: 1    mean?

      2      A    Well, goodwill is intangible or not real

      3    physical assets of a company.  Typically, they'd be

      4    things like, customer/client lists, reputation,

      5    brand names, perhaps existing contracts, but those

      6    things that are not hard physical assets that are

      7    value to a company.

      8      Q    And those client relationships?

      9      A    Client relationships, yes.

     10      Q    You indicated that the intent was to be

     11    equal partners, but ultimately the ownership

     12    structure, as I understand it, in Beacon Scientific

     13    is 51% of -- owned by Mr. Saunders and 49% owned by
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    14      you.
    15              Can you amplify that?
    16      A    Yeah, that's correct.  Ultimately,
    17      Mr. Saunders was slightly higher in percentagewise.
    18      He was a majority member and I was minority member
    19      by couple percent.
    20              MR. WHITWORTH:  Okay.  Why don't we just
    21      take a brief five-minute break?
55: 1              THE WITNESS:  Okay.
     2              MR. WHITWORTH:  And then we can start
     3      back.  Is that good for everybody?
     4              THE VIDEOGRAPHER:  All right.  Going off
     5      the record.  The time is 10:59.
     6              (A break was taken.)
     7              THE VIDEOGRAPHER:  And going back on the
     8      record.  The time is 11:09.
     9      BY MR. WHITWORTH:
    10      Q    Great.  Thank you very much.  Again,
    11      this is Ramsay Whitworth and just continuing the
    12      examination.
    13              Dr. Kiddy, you understand you're still
    14      under oath?
    15      A    Yes.
    16      Q    Great.  When we took a break we were
    17      talking about the discussions that you had with
    18      Mr. Saunders and the professionals that you each
    19      retained to assist you in the formation of Beacon
    20      Scientific.
    21              Did Ms. Feinman provide any advice to
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

56: 1    you and Mr. Saunders relative to -- to tax savings

2    and how you should structure the company?

3    A    Yes, she did.

4    Q    What was that?

5    A    One of the issues that she discussed was

6    that, although we'd be forming the company as an

7    LLC, that we would want to elect to be taxed as an S

8    Corporation.  There were also some other issues with

9    respect to setting up the company with respect to

10    capital accounts and tax implications of how we'd do

11    that.

12    Q    And --

13    A    And I'm sorry.  And whether we could

14    file as an S Corporation based on how we setup the

15    capital accounts.

16    Q    Had you had any previous experience with

17    S Corporations?

18    A    No.

19    Q    Or electing to be taxed as an S

20    Corporation?

21    A    I had not.

57: 1    Q    Okay.  Did -- during your course of your

2    involvement in this case or in formation of Beacon

3    Scientific, were you education about that?

4    A    I was.

5    Q    Who did you rely upon for that

6    education?

7    A    Ms. Feinman.

8    Q    I'm showing you what's been marked as

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 9        Exhibit 3, which is an e-mail exchange between --
10        e-mail chain, the first of which is between you and
11        Mr. Saunders on April 27, 2017.
12                Do you see that?
13        A    I do.
14        Q    And in it, you say, "See attached.  I
15        haven't had a chance to look at the attachment yet."
16                And this is forwarding an e-mail between
17        Ms. Feinman and Mr. Saunders on that same day, April
18        27, 2017, is that correct?
19        A    It is.
20        Q    Okay.  And then the attachment -- if
21        you'll turn to the second page to make sure I've
58: 1     identified this document correctly.  Is that the
 2        attachment to the e-mail that you received?
 3        A    I believe so.
 4        Q    Okay.  Was Ms. Feinman that created this
 5        e-mail -- actually, this attachment?
 6        A    Yes, created this attachment.
 7        Q    Okay.  You've reviewed it?
 8        A    I have reviewed it.
 9        Q    And what did you understand it to mean
10        when you got it?
11        A    Ms. Feinman was basically showing us the
12        tax savings that we would be able to obtain if we
13        filed as an S Corporation, instead of just an LLC.
14        Q    So if you take a look at the spreadsheet
15        at the top of -- titled, "S Corp v LLC," do you see
16        that?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

| | | |
|---|---|---|
| 17 | A | Yes. |
| 18 | Q | And then at the bottom, it says -- it |
| 19 | identifies four different scenarios? |
| 20 | A | Correct. |
| 21 | Q | And then at the bottom, it says, "Note |

59: 1    each scenario is based on net income distributed per

2    person," right?

3         A    Correct.

4         Q    And so, ultimately, you and Mr. Saunders

5    agreed on total net income per person of $250,000 as

6    base, right?

7         A    Eventually, we did.  I don't think we

8    had by the time this was put together.

9         Q    Okay.  You were still having those

10    discussions at that time in April of 2017?

11        A    I think so.

12        Q    Okay.  So let's take a look at scenario

13    two on this exhibit, anyway, just so we understand.

14             What was your understanding when you

15    reviewed this as to what this was reflecting if the

16    net income per person was $250,000 of net income?

17        A    Sure.  Well, what it shows is that as an

18    S Corporation you can split the income between

19    salary and distributions, whereas, an LLC it is just

20    income.  Salary and distributions are taxed

21    differently, and so, there ends up being a benefit

60: 1    to being able to file as an S Corporation.  This

2    shows her estimation that individually we would save

3    $2,900 a year in taxes if we filed as an S

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 4        Corporation under that scenario.

 5             Q    Give me one second.  I'm going to allow

 6        this fire truck to go by during the examination.

 7        It'll probably happen a couple times throughout the

 8        day since we're right here on Pratt Street.

 9                  Probably just pause for a minute.

10                  THE VIDEOGRAPHER:  Sure --

11                  MR. WHITWORTH:  Even though I think

12        it's calming down.

13                  THE VIDEOGRAPHER:  Go off the record?

14                  MR. WHITWORTH:  Actually, it turned out

15        calmly.  I think we're okay.  Thank you.

16                  THE VIDEOGRAPHER:  Sure.

17        BY MR. WHITWORTH:

18             Q    Can you look specifically at each of the

19        lines under the phrase "S Corp," and it indicates,

20        income, 250, distributions, 100,000, salary,

21        150,000.

61: 1             What did you understand that to reflect?

 2             A    She's dividing the income of 250 between

 3        those two categories; a hundred thousand into the

 4        distributions and a hundred and fifty into salary.

 5             Q    Okay.  And so, based upon Ms. Feinman's

 6        analysis and recommendations, did you and George

 7        have discussions about whether or not to follow her

 8        advice and seek to be taxed as an S Corp versus an

 9        LLC?

10             A    I think it was fairly obvious that

11        there's benefits to being an S Corp.  So that's what
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

12      we strive to do.

13          Q    And, did you and Mr. Saunders have

14      discussions relative to that?

15          A    I'm sure we must have.  We agreed upon

16      it.

17          Q    And, did you then move forward in

18      advising Mr. Rife and Ms. Feinman to structure the

19      deal in accordance with that advice to be an S Corp?

20          A    Yes.  I'm not sure exactly who relayed

21      that information to Mr. Rife, but that was the

62: 1   direction that we gave him.

2           Q    Okay.  Ultimately, what was the deal

3       that you and Mr. Saunders agreed to?

4           A    With respect to my investment?

5           Q    Yeah.  How to structure the deal?  What

6       was your initial investment to be?

7           A    Sure.  Well, I agreed to ultimately

8       invest $400,000 into the new company, which would be

9       ultimately available for Mr. Saunders to obtain from

10      the company.  Mechanism of that was initially set at

11      -- set out as him obtaining that extra -- or that

12      portion of his payment as excess salary.

13               So it was a salary above what I was

14      receiving that he could basically pull as I put

15      money in --

16          Q    How did you arrive at the number of

17      400,000?

18          A    Mr. Saunders I guess on the advice of

19      Ms. Feinman, engaged an accounting firm to provide a

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

|   |   |
|---|---|
| 20 | valuation of Saunders Engineering Consulting that we |
| 21 | used as a basis for the discussions. |
| 63: 1 | Q     And what do you mean that you used that |
| 2 | as a basis for the discussions? |
| 3 | A     They came up with a valuation that I |
| 4 | didn't feel comfortable with, wasn't entirely in |
| 5 | agreement with.  So that's not the number that we |
| 6 | ended up settling upon, but it gives us a starting |
| 7 | point. |
| 8 | Q     And how is it agreed that you would pay |
| 9 | the $400,000? |
| 10 | A     After some discussions, it was -- well, |
| 11 | $50,000 would be paid upfront from my initial |
| 12 | contribution for the cash flow reasons.  The extra |
| 13 | -- the $350,000 extra would be paid back to the |
| 14 | company in the form of a loan.  So the company would |
| 15 | receive that money from me over a period of time |
| 16 | based on the loan agreement. |
| 17 | Q     And what was the discussions or |
| 18 | understanding as to when you would obtain your 49% |
| 19 | interest? |
| 20 | A     I was 49% member from day one. |
| 21 | Q     And, did you and George agree on what |
| 64: 1 | the source of your repayment of that loan would be? |
| 2 | A     We agreed that if I were to receive |
| 3 | compensation above a certain amount, that any |
| 4 | compensation above that amount I would have to pay |
| 5 | 50% of it against the loan.  Of course, I was |
| 6 | welcome to pay more than that, but that was the |

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    7        minimum that was required.

    8                MR. KAGAN:  Objection, move to strike.

    9        Again, this will just be a continuing objection.

   10            Q    When you use the phrase compensation

   11        over a certain amount, to what were you referring?

   12            A    Well, initially, I was familiar with

   13        being paid a salary and my first thought was that I

   14        would receive a salary of "X" amount, anything above

   15        that salary would be a distribution -- would be

   16        profit that would be distributed to us.

   17                Based on the S Corp discussions, an

   18        analysis by Ms. Feinman came to realize that the

   19        compensation is really a combination of salary and

   20        distributions.  So when the two of those reached a

   21        certain amount, anything above that I would have to

65: 1        pay 50% back.
```

**Note:** OBJECTION RELEVANCE

**Pg: 66 Ln: 15 - Pg: 67 Ln: 11**

**Annotation:**

```
66:15    Q    And, so based upon the agreement that

   16        you reached with Mr. Saunders that your initial base

   17        compensation would be 250,000, did you and

   18        Mr. Saunders agree on how you would pay specifically

   19        the remaining amount of your initial $400,000

   20        investment?

   21                MR. KAGAN:  Objection continuing.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
67: 1              A     We agreed that when my compensation, the

    2         combination of the two exceeded $250,000 that 50% of

    3         any excess would be paid back against the loan.

    4              Q     And is that on an annual basis?

    5              A     Yes, on an annual.

    6              Q     Okay.  Could you give us an example?

    7              A     Sure.  If we were to have been paid

    8         $300,000 in a year, a hundred fifty in salary and a

    9         hundred fifty in distributions, that would have been

   10         $50,000 over the $250,000 base.  So, I would owe the

   11         company a minimum of $25,000 against the loan.
```

**Note:** OBJECTION RELEVANCE

**Pg: 68 Ln: 19 - Pg: 69 Ln: 15**

**Annotation:**

```
68:19  Q    And considering that Mr. Saunders owned

   20         a little bit more equity than you and had the right

   21         to select the third member of the managing

69: 1         committee, did you have any expectations as to how

    2         Mr. Saunders would conduct himself and make

    3         decisions as a member of the management committee?

    4                   MR. KAGAN:  Objection.

    5              A     Yeah.  I expected him to be

    6         professional, to be truthful, to be honest, to be

    7         working -- excuse me, working in the best interest

    8         of the company, to be working in the best interest

    9         of the other members of the company.  I expected him
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
10        to, you know, approach any disagreements, you know,

11        again, as a professional and to talk and to work

12        them out.  I expected him to be, you know,

13        forthright in his communications, and you know,

14        really just to act in the best interest of the

15        company and the members.
```

**Note:** OBJECTION

**Pg: 70 Ln: 14 - Pg: 89 Ln: 10**

**Annotation:**

```
70:14  Q    And if you could turn to Exhibit 4 in

15        your binder, please.  Can you identify this exhibit

16        for us, please?

17        A    This is a -- I think two sets of

18        e-mails, but there's an e-mail from Mr. Rife to

19        Mr. Saunders and I on March 31st, then there's also

20        on the third page a short response from me on the

21        same date, just shortly thereafter, back to Mr. Rife

71: 1     thanking him for --

 2              MR. KAGAN:  Again, we'll object for the

 3        record and ask for continuing objection.

 4              MR. WHITWORTH:  So noted.

 5        Q    What was your understanding as to the

 6        purpose of this e-mail exchange?

 7        A    Primarily --

 8              MR. KAGAN:  Objection.  Go ahead, you

 9        can answer.
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

    10        A       Primarily, Mr. Rife was sending

    11        Mr. Saunders and I a draft of the operating

    12        agreement and what was called the loan agreement for

    13        us to review.  He discussed some of the issues that

    14        we've talked about, how to structure the company to

    15        abide by the S Corp requirements, but yet meet

    16        Mr. Saunders' needs for being taxed with respect to

    17        the S Corp.  Also, meeting my needs with respect to

    18        how I'm making the payments back and -- and the

    19        responsibility for that.

    20        Q    In the first paragraph, Mr. Rife

    21        represents to you and Mr. Saunders, "We had earlier

72: 1        discussed the possibility of crediting George with a

    2        400K capital account and then having Jason 'catch

    3        up' by making capital contributions from his

    4        distributions of profit ('Equity Method').  After

    5        several discussions with Lisa became apparent that

    6        in order to preserve the S Corp tax status and also

    7        to avoid adverse tax consequences to George, Jason's

    8        buy-in needs to be in the form of a loan."

    9            Did I read that correctly?

    10        A    You did.

    11        Q    Okay.  So I want to ask you about the

    12        first sentence.  Did you have discussions with Mr.

    13        Rife and Mr. Saunders relative to the possibility of

    14        initially crediting Mr. Saunders with $400,000

    15        capital account and then having you catch up by

    16        making capital contributions from your distributions

    17        of profit?

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

18        A    When we first met with Britt I think

19        that was the way that he envisioned structuring it,

20        but again, after we -- we left his office and he

21        started to, sort of, put pen to paper and talk to

73: 1        Ms. Feinman, he realized that wasn't going to work.

2        Q    And in the second sentence, did you

3        understand -- or you had further conversations with

4        Mr. Rife about his representation about Lisa's

5        recommendations or how to reserve the S Corp tax

6        status and to help Mr. Saunders avoid adverse tax

7        consequences by structuring your remaining

8        investment payments as the form of a loan?

9             MR. KAGAN:  Objection.

10        A    I'm sorry, I -- yes, we -- we -- that's

11        what he's discussing here and -- and he's, you know,

12        sort of explaining that we need to change plans

13        based on the S Corp election plan.

14             MR. KAGAN:  Objection, move to strike.

15        Q    Did you have concerns about having the

16        document -- the -- your initial investment

17        structured as a loan?

18        A    Initially, I did.  It was a lot of

19        money, and you know I was relying upon

20        Mr. Saunders', you know, representation of how the

21        company was doing, and also being new to forensic

74: 1        engineering, not sure it was something that I wanted

2        to stake a career or rest my career on, but if I --

3        I -- you know -- made the investment, it would be

4        very difficult to pay it back if -- if, sort of, the

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     5      venture didn't work.

     6              So I think in our original meeting that

     7      was my concerns, and I think Mr. Rife was here

     8      trying to find a way to alleviate my concerns, but

     9      yet still structure it as a loan so that we can

    10      maintain the S Corp.

    11          Q    And if you'll look at the middle of the

    12      paragraph on the first page, it references Section

    13      5.3.  Do you see that?

    14          A    Yes.

    15          Q    And in it, Mr. Rife says, "While all

    16      company decisions will be made by the management

    17      committee, this section provides that each of you

    18      will receive a salary in accordance with industry

    19      standard.  This provides protection to the member

    20      who does not control the management committee."

    21              Did I read that correctly?

75:  1          A    Yes.

     2          Q    And who was the member that did not

     3      control the management committee?

     4              MR. KAGAN:  Objection --

     5          A    I was the --

     6          Q    You can answer.

     7          A    I was the member that did not control

     8      the management committee.

     9          Q    And was that a important provision for

    10      you?

    11              MR. KAGAN:  Objection.

    12          A    That was the provision that Britt added.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

    13      Obviously, it made sense and I appreciated him doing

    14      it.  It wasn't something that I had specifically

    15      asked him to do or considered before, but it was

    16      something that he -- he caught and he put in there.

    17          Q    You'll turn to the third page, you

    18      acknowledge that there's a second e-mail in this

    19      exhibit string.  This is an e-mail from you to Mr.

    20      Rife and Mr. Saunders on March 31, 2017 at 12:30

    21      p.m.?

76: 1          A    Yes.

    2          Q    And in the last sentence you say, "I

    3      appreciate you working so hard to come up with an

    4      arrangement that meets all of our goals," is that

    5      right?

    6          A    That's correct.

    7          Q    Does that comport with your

    8      understanding that Mr. Rife was representing both

    9      you and Mr. Saunders in these document preparations?

    10          MR. KAGAN:  Objection.

    11          A    It does.

    12          Q    Did Mr. Rife prepare a draft operating

    13      agreement, draft loan agreement?

    14          A    Yes, I believe it was attached to these

    15      e-mails.

    16          Q    And what changes to the loan agreement

    17      and operating agreements, if any, were discussed

    18      between you and Mr. Saunders?

    19          MR. KAGAN:  Objection, continuing

    20      objection.

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     21          A     At this point, I don't know that we had

77: 1     any direct -- or any changes that were directed by

     2     either of us looking at them.  I think from our

     3     standpoint, we were -- we sent them on to Lisa to

     4     let her -- Ms. Feinman to let her review them.

     5               I think we had some discussions based on

     6     some of the buy-out provisions with respect to death

     7     or disability of one of the members that we

     8     discussed, but I don't remember any specifics.

     9          Q     We'll let that siren pass.  Give me one

    10     second.

    11               Okay.  Can you turn to Exhibit 6,

    12     please, which will be, I think, the next one.

    13          A     Yep.  Sorry.

    14          Q     This is an e-mail chain.  The first of

    15     which is from Mr. Saunders to you on June 19, 2017

    16     at 10:31 a.m., correct?

    17          A     Correct.

    18          Q     Okay.  Can you identify this?

    19               MR. KAGAN:  Objection, continuing

    20     objection.

    21          A     Yes.  Mr. Saunders had received an

78: 1     e-mail from Ms. Feinman, actually, Friday evening --

     2     or afternoon.  He forwarded it to me on a Monday

     3     morning.

     4          Q     And so that's the e-mail exchange at the

     5     bottom that's June 16, 2017?

     6          A     That'll be the second one in this, yes.

     7          Q     After you received this e-mail from
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

8      Mr. Saunders, did you have a conversation with him

9      about it?

10          A     Yeah.  We talked about sort of

11     finalizing everything we needed to get Britt to make

12     changes to the -- to the operating agreement, the

13     loan agreement.

14          Q     And did you discuss the specific

15     contents of Ms. Feinman's e-mail and the suggestions

16     that she was making relative to the loan agreement?

17          A     We talked about her suggestions.  I

18     think we wrapped up the discussion on the life and

19     disability insurance, and I think we finalized how

20     much we were going to be compensated.

21          Q     And if you'll look at bullet point No.

79: 1   3, Ms. Feinman says, "We don't know how much we're

2      going to payout in distributions.  I suggest making

3      the payment equal to 50% of salary and distributions

4      in excess of a certain base amount.  For instance,

5      if Jason's base salary is going to be 200,000, the

6      language could state 'borrower shall pay an amount

7      equal to 50% of salary and distributions in excess

8      of 200,000 per year to lender as principal and

9      interest on the unpaid balance of the principal sum

10     period.'"

11                Did I read that correctly?

12          A     Except you said bullet point three,

13     instead of two.

14          Q     Oh, two.  Okay, thank you.

15                And did you and Mr. Saunders have

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

16          discussions about that suggestion?

17                    MR. KAGAN:  Objection.

18          A     Yes.

19          Q     And after you and Mr. Saunders had those

20          discussions, what did you do?

21          A     I sent an e-mail to Britt asking him to

80: 1       make sort of final set of changes to the documents,

2           and included this suggestion from Lisa as well as

3           the other things I discussed.

4           Q     Showing you now -- go back -- I'm sorry,

5           for them being slightly out of order.

6                    Back to Exhibit 5.  Can you identify

7           this string of e-mails, and I'll ask you to kind of

8           go from the back forward?

9           A     Sure.

10                   MR. KAGAN:  And objection, continuing

11          objection.

12          A     This is a -- an e-mail exchange, you

13          know, replies that -- starts back with an e-mail set

14          that we looked at earlier with Mr. Rife sending us

15          the original draft agreements, some back and forth

16          about progress and how things are going.

17                   Ultimately, it shows on page 2 of this

18          exhibit an e-mail on June 19th where I requested

19          Britt to make these changes to the agreement -- the

20          agreements that -- that we just talked about you and

21          I, and then Britt's response to that shortly

81: 1       thereafter.

2           Q     Okay.  So -- just so that the record is

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     3         clear as to the exhibit, the first page of the

     4         exhibit is an e-mail chain, the first of which is

     5         from Mr. Rife to you and Mr. Saunders dated June 21,

     6         2017 at 10:48 a.m., correct?

     7              A    That's correct.

     8              Q    And then you just referenced an e-mail

     9         on the second page, which was your e-mail to Mr.

    10         Rife and to Mr. Saunders on June 19, 2017 at 12:04

    11         p.m., correct?

    12              A    Yes.

    13              Q    And at the bottom, it says, "In addition

    14         to that change, Lisa had a couple of suggestions

    15         copied below."

    16              A    Correct.

    17              Q    And did you cut and paste the

    18         suggestions that Lisa had made that we just looked

    19         at in Exhibit 6 and placed that in the body of your

    20         e-mail?

    21              A    That's correct.

82:  1              Q    Did you make a change?

     2              A    The only change I made was that I

     3         modified what was $200,000 per year as total

     4         compensation in her e-mail.  I changed that to

     5         250,000.

     6              Q    And at the bottom, you say, "George,

     7         note that I changed the 200,000 in Lisa's e-mail to

     8         250,000 which I believe you are in agreement with as

     9         our base salary."

    10                   Did I read that correctly?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
11        A     Yes.

12        Q     And then you say, "If not speak now or

13   forever hold your piece," is that correct?

14        A     That's what I wrote.

15        Q     After you sent this e-mail, did

16   Mr. Saunders ever speak to you or note any

17   objections to this language being included in the --

18   let me rephrase that.  It was a poorly crafted

19   question.

20              After you sent this e-mail, the June 19,

21   2017 e-mail to Mr. Rife and to Mr. Saunders, did

83: 1   Mr. Saunders voice or -- vocally or in writing any

2    objections to you about these suggestions from Ms.

3    Feinman?

4         A     No, he never objected to Ms. Feinman's

5    suggestions.

6         Q     And did he note any objection to you

7    about the change of the $200,000 compensation to

8    250,000?

9         A     No, that was his decision.  So I'm

10   sure he's happy with it.

11        Q     And Mr. Rife's response back to you

12   indicated that "The payment of 50% of excess salary

13   took a bit more verbiage than Lisa contemplated, but

14   I think I have captured her suggestion."

15              Did I read that correctly?

16        A     You did.

17        Q     And did you read the -- the document

18   that Mr. Rife sent to you, his draft?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

|     |     |     |
| --- | --- | --- |
| 19 | A | Yes. |

20      Q      And based upon your review, did you

21      believe and understand that it had contemplated --

84: 1   it had captured Ms. Feinman's suggestion?

2      A      Yeah.  I read it and I -- I saw what I

3      was looking for, in terms of combination of salary

4      and distributions and/or 50% of excess.  So I

5      believe it captured her suggestions as he said it

6      did.

7      Q      I'm going to show you what actually has

8      been marked as Defense Exhibit L which is the same

9      as our Plaintiff's Exhibit 5.  However, it has the

10      attachments meaning specifically Mr. Rife's draft

11      operating agreement and draft loan agreement that

12      were sent at that time.  Give me one moment.

13          Do you want me to use the -- yeah, I

14      think that makes sense, thank you.

15          I'm going to approach.  I'm handing you

16      what will be marked as Defense Exhibit L.  And just

17      to confirm, that's the same e-mail exchange,

18      correct, as -- as Plaintiff's 5?

19      A      It appears to be.

20      Q      Okay.

21      A      Yep.

85: 1   Q      And then if you'll turn to the

2      attachments, you'll see the first of which at least

3      in my packet is the draft loan agreement?

4      A      I agree.

5      Q      Okay.

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 6              MR. KAGAN:  I'm just going to object for
 7      the record and ask for a continuing objection with
 8      regard to this exhibit.
 9         Q    And at paragraph three under "Payments,"
10      you'll see that there is -- there are words that
11      have an underline to them and words that have been
12      stricken out.
13              Do you see that?
14         A    Not on this version.
15         Q    Are you on the loan agreement?
16         A    Yes, but I'm on a clean version not the
17      stricken version.  Hold on.
18              Yes, I got it.  I'm sorry.  Yes, I'm on
19      a version now that has the red line.
20         Q    Okay, great.  And what was your
21      understanding what the red line reflected?
86: 1      A    The changes that Mr. Rife had made to
 2      the document.
 3         Q    And meaning additional new language?
 4         A    New language and things that were
 5      erased.
 6         Q    Right.  So, if it was -- it was erased,
 7      it had that stricken --
 8         A    Correct.
 9         Q    -- out in the middle of it?
10              Okay.  And when you read this, what was
11      your understanding?
12              MR. KAGAN:  Objection, continuing
13      objection.
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

14          A      My understanding was that Mr. Rife

15      countered Lisa's suggestion that I would be

16      responsible for paying back to the loan any

17      compensation which included salary and/or

18      distributions in excess of $250,000.

19                  I'm sorry, I'd have to pay 50% of excess

20      compensation.

21          Q      And did you review the edits that Mr.

87: 1   Rife made to the operating agreement which is also

2       in that packet?

3           A      Yes.

4           Q      And were they responsive to the request

5       that you had asked him to make, including

6       specifically as to the disability insurance which

7       can be found at paragraph 7.4?

8           A      Excuse me.  Yes, I reviewed this and was

9       in agreement with them as well.

10          Q      Can you turn to paragraph -- to

11      Plaintiffs Exhibit 7, please?

12          A      Yes.

13          Q      And can you identify this document?

14          A      Excuse me.  This is an e-mail from

15      Mr. Saunders to myself, Mr. Rife and Ms. Feinman.

16      Also, cc'ing a second e-mail address for

17      Mr. Saunders.

18                  But, basically attaching the final

19      versions of the loan agreement and operating

20      agreement.

21          Q      In it Mr. Saunders says, "Jason and I

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

88: 1    have discussed these changes (and they are minor).

2    So assuming you all have no objections, we will sign

3    them today and get the bank account opened this

4    afternoon."

5          What were the minor changes that were

6    made to this final version that you and Mr. Saunders

7    discussed in May?

8          MR. KAGAN:  Objection, continuing

9    objection.  Sorry.

10     A    I believe the final change was to set

11    the interest rate on the loan to a fixed percentage,

12    as opposed to a variable percentage simply to make

13    the accounting easier to track the interest on it.

14     Q    And did Mr. Rife and Ms. Feinman confirm

15    their acceptance of the documents and the minor

16    changes you guys had made?

17          MR. KAGAN:  Objection.

18     A    I don't believe they responded in the

19    negative.  So I -- I think passively accepted it.

20          MR. KAGAN:  Objection, move to strike.

21     Q    And just so that we're clear, if you

89: 1    look at Exhibit 7, were -- you'll note that

2    Mr. Saunders' attachments that reflects the

3    operating agreement -- Beacon Scientific operating

4    agreement, June 22, '17, and Beacon Scientific

5    operating agreement, June 22, '17, do you recall was

6    the actual loan agreement attached to Mr. Saunders'

7    e-mail on June 23rd?

8     A    Yeah, I think we've realized that

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 9          Mr. Saunders attached the operating agreement twice;

10          did not attach the loan agreement to this e-mail.
```

**Note:** OBJECTION RELEVANCE

**Pg: 91 Ln: 4 - 8**

**Annotation:**

```
91: 4   Q   And was that in accordance with your

     5       understanding that your interest in the company

     6       immediately vested at the time you signed the

     7       operating agreement?

     8           A    Yes.
```

**Note:** OBJECTION

**Pg: 93 Ln: 7 - Pg: 98 Ln: 12**

**Annotation:**

```
93: 7   Q   And if we turn to Section 5 of the

     8       agreement, it's titled, "Management Writes, Powers,

     9       and Duties," right?

    10           A    Yes.

    11           Q    And then Section 5.1 is titled,

    12       "Management and Management Committee," and it says

    13       under 5.1.1, "All powers of management for the

    14       company shall be solely vested in, and the business

    15       and affairs of the company shall be managed under

    16       the direction and control of, a management committee
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

|  |  |  |
|---|---|---|
| 17 | | (the "Management Committee"), which shall consist of |
| 18 | | three individuals, who need not be members.  The |
| 19 | | management committee initially consists of the |
| 20 | | following persons:  Saunders, Kiddy and (to be |
| 21 | | determined)." |
| 94: 1 | | Did I read that correctly? |
| 2 | | MR. KAGAN:  Objection -- |
| 3 | A | You did. |
| 4 | Q | Under Section 5.1.2, it says, "All |
| 5 | | powers of the company shall be exercised by or under |
| 6 | | the authority of the management committee." |
| 7 | | Did I read that correctly? |
| 8 | | MR. KAGAN:  Objection. |
| 9 | A | Yes. |
| 10 | Q | And then going forward Section 5.1.3 |
| 11 | | discusses meetings of the management committee, |
| 12 | | correct? |
| 13 | A | It does. |
| 14 | Q | And then at the very bottom under |
| 15 | | Section 5.1.4, can you read that for us, please? |
| 16 | | MR. KAGAN:  Objection. |
| 17 | A | "5.1.4 Decisions of the management |
| 18 | | committee shall require the approval of at least two |
| 19 | | (2)," numeral two, "of its members." |
| 20 | | MR. WHITWORTH:  Okay.  Let's go off the |
| 21 | | record for one second. |
| 95: 1 | | THE VIDEOGRAPHER:  Sure.  Going off the |
| 2 | | record.  The time is 11:48. |
| 3 | | (A break was taken.) |

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 4                    THE VIDEOGRAPHER:  Going back on the

 5           record.  The time is 11:54.

 6           BY MR. WHITWORTH:

 7                Q     Again, this is Ramsay Whitworth.  I'm

 8           your counsel continuing our examination of Dr.

 9           Kiddy.  I am still in Exhibit 9 which is the

10           operating agreement.

11                    I'm turning your attention to Section

12           3.5.  It is titled, Liability for Acts and

13           Omissions."  Do you see that?

14                A     Yes, sir.

15                Q     And in it it's a long provision, but

16           I'll just read the beginning of it and the end of

17           it.

18                    It says, "Members shall not be liable,

19           responsible or accountable and damages are otherwise

20           to any of the members for any act or omission

21           performed or omitted in good faith on behalf of the

96: 1        company and in a manner reasonably believed to be

 2           within the scope of the authority granted by this

 3           agreement and in the best interest of the company."

 4                    Did I read that correctly?

 5                    MR. KAGAN:  Objection.

 6                A     Yes.

 7                Q     And did you read this provision when you

 8           read the operating agreement prior to signing it?

 9                A     Yes.

10                Q     Okay.  And you'll see that at the end,

11           it says -- well, I'll read the whole thing.
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    12              The next sentence says, "Any loss or

    13      damage incurred by any member by reason of an act or

    14      omission in good faith and reasonably believed to be

    15      within the scope of authority granted by this

    16      agreement shall be paid from the company assets to

    17      the extent available."

    18              Did I read that correctly?

    19              MR. KAGAN:  Objection.

    20      A       Yes.

    21      Q       And then the last sentence says, "This

97: 1       provision shall not serve to relieve the members

     2      from breach of duty based upon an act or omission,

     3      one, in breach of that person's duty of loyalty to

     4      the company or its members; two, not made in good

     5      faith or involving a material, intentional violation

     6      of the law; or three, resulting in the receipt by

     7      that person of an improper personal benefit."

     8              Did I read that correctly?

     9              MR. KAGAN:  Objection.

    10      A       Yes.

    11      Q       Was this provision important to you?

    12              MR. KAGAN:  Objection.

    13      A       Well, it -- it basically provides some

    14      protection to the members if they are behaving

    15      honestly and would not provide that protection if

    16      they don't.

    17              MR. KAGAN:  Objection, move to strike.

    18      Q       And did that comport with your

    19      understanding and expectations as to how
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
  20      Mr. Saunders as the member with control over the
  21      management committee was to conduct himself as a
98: 1     member of the company?
   2              MR. KAGAN:  Objection.
   3         A    I think it applied to both of us, but
   4      yes, Mr. Saunders as well.
   5         Q    Let me ask that question then more
   6      generally.  Did -- was it your understanding that
   7      Section 3.5 applied to the way in which each of you
   8      as members, you being Dr. Kiddy and the other member
   9      being Mr. Saunders, were to conduct themselves on
  10      behalf of the company?
  11              MR. KAGAN:  Objection.
  12         A    Yes.
```

**Note:** OBJECTION

**Pg: 98 Ln: 20 - Pg: 100 Ln: 18**

**Annotation:**

```
98:20    Q    Okay.  And did you read paragraph three
  21     relating to the payments?
99: 1        A    I did.
   2         Q    And did you read paragraph two relating
   3      to the amount of the debt and the "maturity date"?
   4         A    Yes.
   5         Q    Okay.  What was your understanding as to
   6      when the maturity date was?
   7              MR. KAGAN:  Objection.
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

8          A     20th anniversary of the effective date.

9     So 20 years from 2017, or 2037.

10         Q     20 years to pay the remaining balance of

11    your initial investment?

12         A     If I had not been required to make

13    payments due to the excess compensation up to that

14    point, but yes, at least by the 20th anniversary.

15         Q     And then, for the periodic payments

16    relating to the excess compensation, is that covered

17    in paragraph three?

18         A     It is.

19         Q     Okay.  And what was your understanding

20    -- well, let me back this up and do it piecemeal.

21              Did you read paragraph three?

100: 1         A     I did.

2          Q     Did it comport with what you expected it

3     to say?

4              MR. KAGAN:  Objection.

5          A     Yes, I thought it captured Lisa's

6     suggestions as Britt said it did.

7          Q     And after you read paragraph three, what

8     was your understanding as to what your periodic loan

9     repayment obligations were under the loan agreement?

10         A     Sure.

11              MR. KAGAN:  Objection.

12         A     I was required to pay back 50% of all

13    compensation, which included salary and

14    distributions that was in excess of $250,000.

15         Q     Is that any -- any given year?

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    16            A      Any given year, sorry.  Yes.

    17            Q      On an annual basis?

    18            A      On an annual basis.
```

**Note:** OBJECTION

**Pg: 106 Ln: 16 - Pg: 107 Ln: 2**

**Annotation:**

```
106:16   Q     And how did you decide when to make

    17          repayments?

    18            A     Well, the requirement was when my

    19          compensation exceeded the $250,000.  So I was

    20          tracking my salary and distributions over time.

    21          When they approached $250,000 or going to exceed

107: 1          $250,000, I would make a payment back against the

    2           loan.
```

**Note:** OBJECTION

**Pg: 107 Ln: 8 - 21**

**Annotation:**

```
107: 8   Q     And show you Exhibit 12.  Can you

    9           identify this e-mail by date and recipient and the

    10          attachment?

    11            A     This is an e-mail that I sent to Ms.

    12          Feinman.  It's dated January 18, 2018.  So I -- she

    13          probably requested it based on looking at taxes for
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
14        2017 and started to look at our -- our accounting to
15        prepare the taxes.  The attachment is a spreadsheet
16        that I created to track how much money Mr. Saunders
17        had pulled out as extra salary which was entitled
18        to -- at least in the initial operating agreement,
19        based on the $400,000 that was going to be paid to
20        him for the goodwill.
21                MR. KAGAN:  Objection, move to strike.
```

**Note:** OBJECTION

**Pg: 114 Ln: 7 - 13**

**Annotation:**

```
114: 7   Q    At any point between June of 2017 and
     8        September 5th of 2018, did Mr. Saunders ever
     9        indicate to you his understanding or belief that you
    10        owed payments under the loan agreement that were
    11        different than your understanding?
    12                MR. KAGAN:  Objection to form.
    13            A    No.
```

**Note:** OBJECTION

**Pg: 131 Ln: 16 - Pg: 133 Ln: 7**

**Annotation:**

```
131:16   Q    Could you describe for us your
    17        understanding how that was supposed to work?
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
        18          A     Yeah.   The original operating agreement

        19          -- well, let me say in discussions early on,

        20          Mr. Saunders felt that he probably wasn't going to

        21          need to pull that $400,000 that would be available

   132: 1          to him from the company initial at term.

         2                      And so, he was expecting to be something

         3          more on the lines of a retirement and at which case,

         4          he wouldn't be working as much.  His salary wouldn't

         5          be as high and his tax bracket maybe a little bit

         6          lower.  So pulling the money out as salary was the

         7          initial expectation, but likely, sometime down the

         8          road.

         9                      The operating agreement was written as

        10          such, so that Mr. Saunders was allowed to -- well,

        11          it said that our salary would be equal between the

        12          two of us.  It said that he was able to have

        13          additional salary of $400,000 that he could pull,

        14          essentially, when he wanted.  I believe there was a

        15          -- a phrase in there that it could only be pulled

        16          out as I contributed the money.  Although, we didn't

        17          hold him to that requirement.

        18                      So short answer is he could pull the

        19          money out as salary as he required based on the

        20          original operating agreement.

        21          Q     And so, in light of that, on or about

   133: 1          May 26, 2018, did Mr. Saunders say anything to you

         2          about your need to be making more payments towards

         3          the loan, so that there would be more money

         4          available for him to be able to take out under the
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
5        terms of the operating agreement?

6                    MR. KAGAN:  Objection.

7            A    No, he never said anything about that.
```

**Note:** OBJECTION


**Pg: 152 Ln: 17 - Pg: 153 Ln: 18**

**Annotation:**

```
152:17  Q    Can you turn to Exhibit 15 please?

   18            A    Yes.

   19            Q    Can you identify this document?

   20            A    This is an e-mail -- or an e-mail -- a

   21        chain of e-mails between myself, Ms. Feinman.

153: 1      Earlier e-mails have Mr. Rife on them, as well.

    2                    MR. KAGAN:  And we just object and ask

    3        for a continuing objection.  It's a hearsay

    4        document.

    5            Q    And what was the subject matter of the

    6        e-mails in Exhibit 15?

    7            A    It's the modifications to the operating

    8        agreement and the Asset Purchase Agreement.

    9            Q    And so, is this reflected as of August

   10        of 2018, the Asset Purchase Agreement still not been

   11        executed and signed?

   12            A    It had not been signed at that point in

   13        time.  I think this reflects us discussing sort of

   14        the implementation of it and how it will be recorded

   15        on the -- in QuickBooks, at least it's Ms. Feinman's
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
16        e-mail to us.

17              Q     Okay.

18              A     Or to me.
```

**Note:** OBJECTION

**Pg: 184 Ln: 8 - 13**

**Annotation:**

```
184: 8   Q    As far as you understood, were there any

     9        structures that exist in the operating agreement

    10        that would permit him to force you out of the

    11        company?

    12              MR. KAGAN:  Objection.

    13        A     No.
```

**Note:** OBJECTION

**Pg: 185 Ln: 16 - Pg: 186 Ln: 15**

**Annotation:**

```
185:16   Q    And what was your expectation at the

    17        time as to what would -- you would have to do if he

    18        did voluntarily withdraw?

    19              MR. KAGAN:  Objection.

    20        A     Well, if he voluntarily withdrew as he

    21        laid out in this paragraph you just mentioned,

186: 1        Beacon Scientific would be responsible to pay him

     2        his portion of ownership -- I'm sorry.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    3              Based on the book value of the company,
    4         be forced to pay his proportion of the ownership.
    5         So, essentially, pay half of the book value of the
    6         company to him in addition.
    7              Because he had signed the Asset Purchase
    8         Agreement basically immediately before sending this,
    9         we would -- Beacon Scientific would owe him the
   10         remaining balance of the Asset Purchase Agreement of
   11         the 383, whatever was remaining.
   12         Q    That goodwill Asset Purchase Agreement
   13         amount?
   14         A    The goodwill Asset Purchase Agreement,
   15         what was left that he had not already received.
```

**Note:** OBJECTION

**Pg: 201 Ln: 14 - Pg: 203 Ln: 16**

**Annotation:**

```
201:14   Q    Show you Exhibit 22.  This is an e-mail
     15         that you sent to Mr. Rife on May 11, 2020 at 1:22
     16         p.m., correct?
     17         A    Yes.
     18         Q    What was the purpose of sending this
     19         e-mail?
     20              MR. KAGAN:  Objection, continuing
     21         objection.  It's a hearsay objection.
202: 1         A    When I spoke to Mr. Rife on May 8th, he
      2         expressed that because of COVID he was working from
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     3        home.  He didn't have access to all his files and I
     4        knew that the loan -- I knew how we got to the loan
     5        agreement to where it was.  So I sent him this
     6        e-mail to refresh his memory as to what the loan
     7        agreement -- sort of the history of it and how we
     8        got to where it was and what it was supposed to say.
     9        So I forwarded this information back to him to
    10        refresh his memory.
    11             MR. KAGAN:  Objection, move to strike.
    12        Q    So, on May 8th he sent you an e-mail
    13        saying the intention appears to be something
    14        relating to the purchase loan agreement, and on May
    15        11th you're sending an e-mail essentially
    16        disagreeing and trying to refresh his memory, is
    17        that a fair characterization?
    18        A    I think --
    19             MR. KAGAN:  Objection.
    20        A    I think so, yes.
    21        Q    Okay.  And you say in this e-mail,
203: 1        "Britt, I believe this e-mall from you states that
     2        the changes to the loan agreement dated June 21st
     3        were designed to capture Lisa's suggestion and
     4        intent."
     5             Did I read that correctly?
     6             MR. KAGAN:  Objection.
     7        A    Yes.
     8        Q    And when you say "this e-mail," you're
     9        referring to the e-mail below, which was Mr. Rife's
    10        June 21, 2017 e-mail in which he says, "The payment
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
11          of 50% of excess salary took a bit more verbiage

12          than Lisa contemplated, but I think I have captured

13          her suggestion"?

14              A    Correct.

15              Q    Is that right?

16              A    Correct.
```

**Note:** OBJECTION

**Pg: 204 Ln: 1 - Pg: 205 Ln: 11**

**Annotation:**

```
204: 1   Q    And what did he say?

     2                 MR. KAGAN:  Objection.

     3          Q    Or what was the discussion?

     4                 MR. KAGAN:  Objection --

     5          A    Well, the discussion was, you know,

     6          here's what you were supposed to do.  It's very

     7          clear from Lisa's suggestion and now you're telling

     8          me that that's not what it was.  Why does your loan

     9          agreement not match what you said your loan

    10          agreement says?

    11                 And he didn't know and said he might

    12          have made a mistake, but --

    13                 MR. KAGAN:  Objection.

    14          A    -- he'd have to go back to his office

    15          and get the files to see what was going on.

    16                 MR. KAGAN:  Objection, move to strike.

    17          Q    Show you Exhibit 23.  This is an e-mall
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    18        between you and Mr. Rife on May 12, 2020?

    19             A    Yes.

    20                  MR. KAGAN:  Objection --

    21             A    Well, e-mail from Mr. Rife to me.

205: 1                 MR. KAGAN:  Objection, and continuing

     2        objection.  It's a hearsay document.

     3             Q    Showing you Exhibit 24.  These e-mail

     4        exchanges between you and Mr. Rife later on May 12,

     5        2020, in which Mr. Rife provides answers to certain

     6        questions you had posed to him?

     7             A    Yes.  I had posed a number of -- a

     8        couple of questions to him.  He responded and he

     9        included Mr. Saunders on the response.

    10                 MR. KAGAN:  Objection, continuing

    11        objection on this exhibit.
```

**Note:** OBJECTION

**Pg: 206 Ln: 14 - 20**

**Annotation:**

```
206:14    Q    And at the end of that process, did you

    15        think you had reached a working agreement in

    16        principle?

    17             A    I thought we had an agreement at one

    18        point.  Mr. Saunders changed things the next day and

    19        it kind of failed, but at one point, I did think we

    20        had an agreement.
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

**Note:** OBJECTION

**Pg: 214 Ln: 11 - Pg: 215 Ln: 3**

**Annotation:**

```
214:11   Q    Just to look at a couple of the

    12          documents that reflect some of that testimony, can

    13          you look at Exhibit 28 please?

    14              A     Yes.

    15              Q     Can you identify that?

    16              A     This is an e-mail, an automatic e-mail

    17          that was sent from our -- the main hosting website,

    18          I-power -- I'm sorry, not the main hosting, but the

    19          D&S hosting website -- or D&S hosting place saying

    20          that the password been changed and updated.  So,

    21          again, I didn't have access after he changed the

215: 1          password on the account.

     2              MR. KAGAN:  Objection, move to strike

     3          with regard to this exhibit.
```

**Note:** OBJECTION

**Pg: 217 Ln: 2 - 11**

**Annotation:**

```
217: 2    When I thought we had an agreement in

     3          place on the 13th I believe it was, I asked him to

     4          go ahead and form a new company because I thought in

     5          a day or two I'd be out on my own.  So I had him
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 6        create a new company for me to operate under, which
 7        -- which he did on my instructions, I believe, on
 8        the 15th, but then it sat because we didn't come to
 9        the agreement.
10               MR. KAGAN:  Objection.  Objection, move
11        to strike.
```

**Note:** OBJECTION

**Pg: 239 Ln: 18 - Pg: 241 Ln: 12**

**Annotation:**

```
239:18  Q    All right.  And I believe you testified
   19        to and made some reference in your direct testimony
   20        to valuation that was done by Anderson.
   21               Is that a -- a -- an accounting firm or
240: 1        CPA firm?
    2        A    Anderson Consulting was -- yeah,
    3        accounting or a CPA firm.  I don't know what they
    4        called themselves, but yes.
    5        Q    Yep.  So Dr. Kiddy, if you could look at
    6        the exhibits in front of you and look at Exhibit C.
    7        A    Uh-huh.
    8        Q    Does this appear to be the valuation
    9        from Anderson that you referred to in your direct
   10        exam?
   11        A    Yes, it does.
   12        Q    All right.  And if you go to the last
   13        page of the document, it looks like that the
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    14          conclusion of value, approximate fair market value

    15          of Saunders Engineering Consultants was $1,189,146.

    16                  Do you see that?

    17          A       That was their valuation, yes.

    18          Q       All right.  And do you and I believe you

    19          testified that you didn't feel comfortable with that

    20          number, is that correct?

    21          A       I thought it was a bit inflated, yes.

241: 1          Q       All right.  And that you were not going

     2          to pay -- again, approximately half that would be

     3          $600,000 that you were not willing to pay or borrow

     4          that amount to -- to form this entity, is that fair?

     5          A       I thought that was too high of a price

     6          to pay, and yes.

     7          Q       All right.  And then you and

     8          Mr. Saunders ultimately agreed to, again, 400,000

     9          each, essentially $800,000 --

    10          A       Yes.

    11          Q       Is that fair?

    12          A       Yes.
```

**Note:** OBJECTION

**Pg: 280 Ln: 18 - Pg: 302 Ln: 4**

**Annotation:**

```
280:18  And Dr. Kiddy, I want to ask you some

    19          questions about the loan agreement which is Exhibit

    20          10; Exhibit 10 in the binder.  You can look at it if
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
  21        you need to, just ask you some general questions.
281: 1                The loan amount, as you testified to,
   2        was initially $400,000, correct?
   3             A    Yes.
   4             Q    And there was an interest rate in the
   5        loan agreement of 2% interest, I believe?
   6             A    Yes.
   7             Q    And again --
   8             A    Yeah, that's correct.
   9             Q    We can take look at it --
  10             A    No, that's correct.
  11             Q    -- Exhibit -- Exhibit 10, yeah.  It
  12        looks like in Section 2 that's a percentage --
  13        annual percentage rate of 2% compounded annually?
  14             A    Yes.
  15             Q    On that principal balance of 400,000,
  16        correct?
  17             A    Yes.
  18             Q    And then Section 3, which we'll talk a
  19        little more about, that's -- that's how you as the
  20        borrower would repay the loan, correct?
  21             A    That is correct.
282: 1             Q    All right.  And there wasn't any sort of
   2        specific, you know, payment schedule like you may
   3        see in another promissory note where you pay $10,000
   4        a month for 40 months?  There was no sort of set
   5        schedule to this loan agreement, is that correct?
   6             A    That is correct.
   7             Q    And I think you testified to on direct
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

8       that Section 2 does have a maturity date of -- of 20

9       years, correct?

10          A    Yes.

11          Q    That, again, to the extent there's any

12      principal interest due by the end of the term that

13      it would be due at that time?

14          A    Uh-huh.

15          Q    Okay.  So now, Dr. Kiddy, I do want to

16      ask you some questions about your interpretation of

17      Section 3.

18          A    Uh-huh.

19          Q    So I'll just note for the record, again,

20      I had continuing objections during your testimony.

21      Because, again, the Court has not yet made any

283: 1   pretrial rulings on -- on this agreement.

2           So, again, I'll put my questions, you

3       know, under -- at least at this point, you know,

4       under that category.  Because I'm asking these

5       questions assuming the Court is going to allow

6       parole evidence and allow you to testify as to,

7       again, these e-mails and your understanding.

8           A    Yes, sir.

9               MR. KAGAN:  Is that -- is that fair,

10      Counsel?

11              MR. WHITWORTH:  I understand -- yes, I

12      understand your -- your caveat that by asking these

13      questions you're not waiving your previous objection

14      as to relevance on the basis of parole evidence.

15              MR. KAGAN:  Correct.  I've got to cross

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

16   examine him based upon the questions that you asked

17   of which I objected to.  So I'm just kind of noting

18   -- you know -- noting that and --

19          MR. WHITWORTH:  I do understand and

20   agree with that.

21          MR. KAGAN:  All right.  Thank you,

284: 1   Counsel.

2   BY MR. KAGAN:

3          Q     So looking at plaintiff'S exhibits, Dr.

4   Kiddy, if you can look at -- believe it would start

5   with Exhibit 6.

6          A     Okay.

7          Q     So Exhibit 6 is an e-mail from Lisa

8   Feinman to Mr. Saunders, dated June 16, 2017, where

9   Ms. Feinman makes some suggestions with regard to

10   how the loan should be paid back by you as borrower.

11          Do you see that?

12          A     Yes.

13          Q     And then Mr. Saunders forwards that

14   e-mail to you on June 19, 2017, is that correct?

15          A     Yes.

16          Q     And then if you look at -- I believe

17   it's Exhibit -- Exhibit 5.  If you look at

18   Exhibit 5, turn to the second page of that.  This is

19   where, Dr. Kiddy, you send an e-mail to -- to Britt

20   Rife and you copy Mr. Saunders where you incorporate

21   Ms. Feinman's suggestions and forward that to Mr.

285: 1   Rife who's working on the agreements, correct?

2          A     Correct.

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

3      Q     And I believe you testified to in your

4      direct that, on the second page of that e-mail to

5      Mr. Rife dated June 19th, so that's Kiddy 657, that

6      you modified her suggestions just with regard to the

7      compensation amount of 250,000, is that correct?

8      A     Yes, sir.

9      Q     Cause her e-mail had 200,000?

10     A     That's right.

11     Q     And you had just made the change of

12     250,000, and you note to George, you know, if not

13     speak now or forever hold your piece with regard to

14     the number that you all are going to put in there --

15     A     Yes.

16     Q     -- correct?

17           All right.  And again, looking now at

18     your e-mail since we're in Exhibit 5 and if you go

19     to that No. 2 of the suggestion, at the end, she

20     actually puts some proposed language in quotes.  Do

21     you see that?

286: 1     A     I do.

2      Q     And the quote says, "Borrower shall pay

3      an amount equal to 50% of salary and distribution in

4      excess of $250,000 per year to lender as principle

5      in interest on the unpaid balance of the principle

6      sum."

7      A     Yes --

8      Q     Do you see that?

9           And that is forwarded to -- to Mr. Rife

10     as he is working on the operating agreement, is that

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

11      correct?

12          A    Yes.

13          Q    All right.  And if you could and I

14      believe I asked you to do this in your deposition,

15      I'll ask it -- to do it here.  If I could hand you a

16      highlighter.  If I could pass that over to you.

17      Thank you, Dr. Kiddy.

18              If you would just highlight Ms.

19      Feinman's proposed language in that e-mail that --

20              MR. WHITWORTH:  Hold on a second.

21          Q    -- that you just reviewed.

287: 1              MR. WHITWORTH:  Could we just go off the

2      record for one second?

3              MR. KAGAN:  Sure.

4              THE VIDEOGRAPHER:  Going off the record.

5      The time is 4:40.

6              (A discussion was held off the record.)

7              (Kiddy Exhibit 5A was marked for purpose

8      of identification.)

9              THE VIDEOGRAPHER:  Going on the record.

10      The time is 4:43.

11      BY MR. KAGAN:

12          Q    Dr. Kiddy, what counsel and I have

13      agreed to off the record, so as not to mark up the

14      original Exhibit 5, we've included another copy of

15      Exhibit 5 and we've identified that as Exhibit 5A.

16          A    Yes, sir.

17          Q    And so I'd ask you to turn to 5A, and

18      again, this is on the third page, which is -- it

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

| | |
|---|---|
| 19 | should say at the bottom Kiddy 657. |
| 20 | A    Yes. |
| 21 | Q    And what I requested was if you could |
| 288: 1 | just highlight Ms. Feinman's proposed language |
| 2 | starting with the quotation mark where it says, |
| 3 | "Borrower." |
| 4 | A    Sure. |
| 5 | Q    Just to the end of that sentence. |
| 6 | A    All right.  Will do. |
| 7 | Q    And you can put the highlighter down. |
| 8 | Thank you. |
| 9 | After this e-mail was sent, do you |
| 10 | recall having any discussions with Mr. Saunders in |
| 11 | which he told you that he did not agree with Ms. |
| 12 | Feinman's suggestion -- her suggestion language |
| 13 | about 50% -- paying 50% of salary and distributions |
| 14 | in excess of $2,050 per year? |
| 15 | A    No, we did not have that conversation. |
| 16 | Q    All right.  Do you ever recall having |
| 17 | any discussions with Mr. Saunders where he told you |
| 18 | he would agree to protect up to 250,000 a year in |
| 19 | salary, and that, therefore, you would pay off -- |
| 20 | you know -- make any payments to the loan of 50% |
| 21 | over that salary, but that he wanted 50% of all |
| 289: 1 | distributions paid toward the note?  Do you recall |
| 2 | any discussions about that? |
| 3 | A    No, those discussions did not happen. |
| 4 | Q    All right.  So looking at -- I think now |
| 5 | we're going to shift over to Defendants -- I believe |

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 6          it's Defendants' L, which is the same -- excuse me,

 7          the same e-mail as Exhibit 5, but it just has the

 8          attachments to it, as far as the red-lined

 9          agreements, and I believe your counsel showed you

10          Exhibit L during your direct examination?

11          A     Yes.

12          Q     But this appears to be an e-mail from

13          Mr. Rife to -- to you and Mr. Saunders dated June

14          21, 2017, in which he attaches to it red-lined

15          copies of the loan agreement and the operating

16          agreement, correct?

17          A     Correct.

18          Q     And he says, "Jason and George, please

19          see the revised documents attached.  You should be

20          able to see the red-lined changes.  The payment of

21          50% of excess salary took a bit more verbiage than

290: 1      Lisa contemplated, but I think I've captured her

 2          suggestion.  Please let me know if acceptable."

 3                   That's the e-mail, correct?

 4          A     That is correct.

 5          Q     All right.  And then looking at -- it

 6          should be tabbed there on the exhibit.  It should be

 7          the -- sort of the first tab appears to be the loan

 8          agreement, is that right?

 9          A     Yes, it is.

10          Q     And then I think the second tab is the

11          operating agreement in red line?

12          A     I agree.

13          Q     And the loan agreement also shows the
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
14        red lines, is that correct?

15             A     Loan agreement does.  I'm looking for

16        the red line in the operating agreement, but I'm

17        pretty sure I saw it earlier, so.

18             Q     Okay.

19             A     Yes.  Yes.

20             Q     Okay.  Okay.  And looking at -- excuse

21        me.  The red line from Mr. Rife with regard to the

291: 1    loan agreement, you see in your review during your

2         direct examination, you know, some of the words that

3         were moved and some of the language that was added

4         to Section 3 of the loan agreement, correct?

5              A     Yes.

6              Q     All right.  And would you agree, Dr.

7         Kiddy, that, again, Section 3 is drafted by Mr. Rife

8         is -- the language is different from what, again,

9         Ms. Feinman proposed and what you've highlighted in

10        the other exhibit?

11             A     Yes, and he told us it was in his

12        e-mail, that it took more verbiage than he -- yes.

13             Q     Okay.  And did you ever have any

14        conversations after you received the red line as to

15        why Mr. Rife's red line changes did not track the

16        verbiage that Ms. Feinman suggested?

17             A     I did not.

18             Q     All right.  And I believe you testified

19        to a number of times on direct that you understood

20        that Mr. Rife was -- was your attorney individually,

21        is that correct?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

292: 1    A  Both mine and Mr. Saunders.

2    Q  All right.  Understand.  And that you

3  didn't -- as part of this process, at least in the

4  formation of this entity with the operating

5  agreement and the loan agreement, didn't go out and

6  consult any other counsel?

7    A  No, I understood he was representing me,

8  so I had no reason to.

9    Q  Okay.  All right.  And did you have any

10  conversations with Mr. Rife specifically as to why

11  the red line changes to the loan agreement didn't

12  follow the suggested language of Ms. Feinman?

13    A  No, I assumed he understood the concept

14  and was just doing lawyer things.

15    Q  All right.  And with regard to your

16  understanding of -- again, looking at Mr. Rife's red

17  line of the loan agreement, when you read that, was

18  your -- was your understanding of that language

19  under Section 3 essentially what Ms. Feinman had

20  suggested; that is that the borrower shall pay an

21  amount equal to 50% of salary and distributions in

293: 1  excess of 250,000 per year to lender?

2    A  Yes.  Mr. Rife said that he captured her

3  suggestion and I saw the language that I was

4  expecting to see with respect to distributions

5  and/or salary $250,000.  So I -- I -- I thought he

6  captured her suggestions.

7    Q  All right.  And looking back at what Ms.

8  Feinman had suggested -- so if you need to look at

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     9        the one you highlighted.

    10              With regard to her suggested language,

    11        did you think there was any sort of ambiguity in the

    12        language suggested by Ms. Feinman?

    13        A    No, but I'm not a lawyer, so I didn't

    14        know that it --

    15        Q    Understand.

    16        A    I -- I -- I understood it, yes.

    17        Q    Okay.  Meaning that you understood that,

    18        you know, excess of 250,000 between salary and

    19        distribution was any moneys, either salary or

    20        distributions, over that amount in a given year?

    21              MR. WHITWORTH:  Objection.

294: 1        Q    Correct?

     2        A    I think the way -- well, can you

     3        rephrase that --

     4        Q    Sure.  Let me rephrase it.

     5              Meaning you didn't -- you didn't -- you

     6        didn't think it was ambiguous with regard to the

     7        word "excess" of $250,000 per year?

     8        A    I thought it applied to both salaries

     9        and distributions in combination.

    10        Q    All right.

    11        A    Yes, but I did not think it was

    12        ambiguous.

    13        Q    But, again, as I understand your

    14        testimony with regard to what Mr. Rife drafted in

    15        the loan agreement that you signed is you believe

    16        Section 3 is ambiguous?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
      17          A     Now, after the default was declared and

      18    getting involved in the lawsuit, yes, now I believe

      19    it's ambiguous.

      20          Q     All right.  And looking at Section 3

      21    with regard to the red line and -- and it may be

295:  1    easier -- actually, strike that.

       2          It may be easier just to look at the

       3    clean -- may be easier just to look at the clean

       4    version of the loan agreement as opposed to the red

       5    line.  If you go to Exhibit 10 in the binder,

       6    Plaintiff's Exhibit 10 that's the actual signed copy

       7    of the loan agreement.

       8          A     Yeah.

       9          Q     There may be --

      10          A     Your Exhibit L I think is the same

      11    thing, isn't it?

      12          Q     It is.  If you want to look at that

      13    that's fine.  I think the language is the same.  But

      14    if you want to look at the one you actually signed,

      15    it's Exhibit -- it's Exhibit 10.

      16          A     I'm okay with the Exhibit L.

      17          Q     All right.  So under Section 3 for

      18    "Payments" going through again the -- the -- the

      19    first sentence, it says -- it's acknowledged that --

      20    "that borrower is to be paid distributions of cash

      21    flow by lender in the course of lender's business

296:  1    pursuant to the terms of the operating agreement."

       2          And that is defined in parentheses and

       3    in quotes as "distributions."  Do you see --
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
   4          A     Yes.

   5          Q     -- that?

   6                And you understood in the operating

   7          agreement, and we can look at it if you want, that

   8          cash flow is a defined term where profit

   9          distributions can be made to the members?

  10          A     I agree.

  11          Q     All right.  And then, continuing on in

  12          Section 3, "as well as salary compensation in

  13          connection with borrower's employment by lender,

  14          pursuant to a separate agreement between the

  15          parties," and then, again, in parentheses and in

  16          quotes "salary."

  17                Do you see that --

  18          A     Yes.

  19          Q     -- defined there?

  20          A     Yes.

  21          Q     So, you agree salary and distributions,

297: 1        again, defined separately in that first sentence?

   2          A     Yes, I agree.

   3          Q     And then the next sentence, "Throughout

   4          the term, borrower shall pay lender as principal and

   5          interest on the unpaid balance of the principal

   6          sum," and then A in parentheses, states, "an amount

   7          equal to 50% of such distribution."

   8                So let me just stop there.  Did you have

   9          any understanding when you signed this loan

  10          agreement that -- that you would have to pay 50% of

  11          any distributions of cash flow as part of the
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

        12      repayment of the loan?

        13          A    No, that was not my understanding.

        14          Q    All right.  And then moving on to B,

        15      "also and/or B an amount equal to 50% of salary paid

        16      to borrower in excess to 200 -- excess of 250,000 in

        17      any one-year period," and then in parentheses and in

        18      quotes that's defined as excess salary.

        19                MR. WHITWORTH:  Objection.

        20          Q    Did you understand that you had to pay

        21      50% of any excess salary payments above $250,000 in

298: 1      any one-year period?

         2                MR. WHITWORTH:  Objection.

         3          A    No, that was not my understanding.

         4          Q    All right.  And I believe you testified

         5      that, again, your understanding was consistent with

         6      what Ms. Feinman had suggested, that is that the

         7      excess -- that the excess salary was to --

         8      essentially that salary was to include both base

         9      salary and distributions?

        10          A    I would say excess compensation was to

        11      include salary and distributions.

        12          Q    Right.  And again, going back to Ms.

        13      Feinman's e-mail -- again, doesn't look like she in

        14      her proposed language did any defined terms; she

        15      just had the sentence of the payment would be 50% of

        16      salary and distributions in excess of 250,000 per

        17      year, correct?

        18          A    Correct, and defined terms is some of

        19      that lawyer stuff that I thought required more

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     20        verbiage.
     21             Q     All right.  And then the next sentence,
299: 1        "Borrower shall pay such amounts throughout the term
      2        within 10 business days after receipt of any such
      3        distribution or excess salary payment."
      4                   Do you see that?
      5        A     Yes.
      6             Q     And -- and again, at least your
      7        understanding of -- of the agreement was your
      8        trigger to pay within 10 days would be from, again,
      9        when distributions and salary exceeded $250,000,
     10        correct?
     11        A     5 days, but yes.
     12             MR. WHITWORTH:  I think it's because --
     13        objection.  I think it's because you're reading
     14        Exhibit L, whereas he's reading from Exhibit 10 --
     15             MR. KAGAN:  See that.  Thank you --
     16             THE WITNESS:  Sorry --
     17             MR. KAGAN:  Thank you, Counsel.
     18                   Yes, I'm sorry.  I'm looking at the
     19        actual final signed -- signed version.
     20             THE WITNESS:  I will take your original
     21        advice and go back to that one.
300: 1             Q     Yeah.  So Exhibit 10 --
      2        A     Okay, I'm sorry.  10 days is what --
      3             MR. KAGAN:  Yeah, thank you, Counsel.
      4             Q     Yes.  It looks like the final -- the
      5        final version which is executed by the parties under
      6        Section 3 again says, "Borrower shall pay amounts
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 7        throughout the term within 10 business days after

 8        receipt of any such distribution or excess salary

 9        payment."

10              Do you see that?

11        A    Yes, sir.  Sorry about that.

12        Q    Yeah.  But, again, your understanding of

13        the agreement was, again, that 10-day trigger for

14        you to make any repayments on the loan was only when

15        salary and distribution together exceeded 250 to you

16        in a given year?

17        A    That is correct.

18        Q    All right.  All right.  And I believe

19        you testified to earlier that when Mr. Saunders

20        declared the default in May of 2020 that you had

21        contacted Mr. Rife who was the attorney who drafted

301: 1    the loan agreement and asked him about his

 2        interpretation with regard to this Section 3,

 3        correct?

 4        A    Yes.

 5        Q    All right.  And your testimony was that

 6        Mr. Rife agreed with Mr. Saunders' interpretation,

 7        correct?

 8        A    Yes, he agreed that -- yes.

 9        Q    Okay.  And you also, in your

10        conversations with Mr. Rife -- we looked at some

11        e-mails, but you spoke to him as well.

12              Didn't you also tell him that he -- he

13        screwed you on this agreement?

14        A    I didn't use that word, but yes, I
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
15        expressed my displeasure that he did not accurately

16        capture Lisa's -- Ms. Feinman's suggestions --

17            Q      Right.

18            A      And he wrote something that was

19        different to that, which he was now interpreting it

20        in a way that was never intended.

21            Q      All right.  And did you also tell him at

302: 1    that time that you believed he made a mistake as --

2         as counsel?

3             A      I believe he made -- told him that and

4         he agreed that he might have.
```

**Note:** OBJECTION

**Pg: 329 Ln: 13 - Pg: 331 Ln: 9**

**Annotation:**

```
329:13  Q    Got a lot of paper.  Go back for a

14        moment to the -- the loan agreement.  There's one

15        exhibit I -- I did not show you as part of that.

16        Let me show you Exhibit G --

17            A      Uh-huh.

18            Q      -- if I could.

19            A      Sure.

20            Q      When -- when -- after Mr. Rife sent the

21        red-line versions of the loan agreement and the

330: 1    operating agreement, which -- which we -- we looked

2         at in your testimony, and it looks like he -- he

3         sent that -- go back to the exhibit.  It's Exhibit
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     4         L.
     5                   It looks like he sends you that e-mail,
     6         you and Mr. Saunders, at 10:49 a.m., on June 21,
     7         2017 --
     8         A    Yes.
     9         Q    -- is that right?
    10         A    Yes.
    11         Q    And you respond in Exhibit G.  This is
    12         an e-mail from you to Mr. Rife and Mr. Saunders at
    13         2:11 p.m. that day where you respond and you say,
    14         "Britt, thanks for turning that around so fast.
    15         I've reviewed the changes and see no issues."
    16                   Is that the e-mail you sent?
    17         A    Yes.
    18         Q    And again, that's after, again, you
    19         reviewed the -- you reviewed the documents and this
    20         is your e-mail sort of approving those changes,
    21         correct?
331: 1         A    Yes.
     2         Q    Okay.  And I believe you testified to
     3         earlier, again, between, you know, 10:49 a.m. in the
     4         morning and 2:11 p.m. that afternoon of June 21st,
     5         again, there's no one you talked to or had any
     6         discussions with with regard to why the red line
     7         didn't match the suggested language of Ms. Feinman,
     8         correct?
     9         A    That's correct.
```

**Note:** OBJECTION

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

**Pg: 378 Ln: 16 - Pg: 384 Ln: 4**

**Annotation:**

```
378:16   Q    All right.  With regard to Aither, I'm

     17       just going to reserve -- I'm going to reserve any

     18       further questions on that with regard to, again,

     19       what we'll call for the new consolidated suit where

     20       discovery is still ongoing.  So I'll sort of stop

     21       questioning at this point on that.

379: 1            Dr. Kiddy, you're claiming damages in

      2       this case in the amount of the value of your 49%

      3       interest in Beacon at the time you were terminated

      4       from the company in June 2020, is that correct?

      5       A    Yes.

      6       Q    All right.  And what is that value that

      7       you're claiming?

      8       A    I'm sorry, I don't have it in front of

      9       me.  The valuation was performed by an expert.

     10       Rough numbers, my 49% was worth 1.4 million dollars

     11       according to that valuation.

     12       Q    Okay.  And that's the valuation of the

     13       expert you hired, Mr. Riley?

     14       A    Yes.

     15       Q    All right.  But you had testified to

     16       earlier and I think we looked at Exhibit 17 that,

     17       when you were talking to Mr. Saunders, you believe

     18       the company was worth 4.7 million dollars, is that

     19       correct?
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
       20           A     Somewhere in the 4 millions, yes.  I
       21      don't know if 4.7, but somewhere around that, yes.
   380: 1           Q     If you look at Exhibit 17.  I think it's
        2      the last page.
        3                 Right.  This is spreadsheet that you put
        4      together?
        5           A     Yes.
        6           Q     And I think you testified that you used
        7      sort of the Anderson Company consulting analysis to
        8      put this together?
        9           A     That's right.
       10           Q     And that you -- again, it says their
       11      value $4,751,000 and change.  Do you see that?
       12           A     Yes.
       13           Q     And then, therefore, your 49% share
       14      would be $2,328,000 --
       15           A     Yes.
       16           Q     -- 192.
       17                 But with regard to -- strike that.
       18                 You acknowledge, though, with regard to
       19      any value at this level that you admit that
       20      Mr. Saunders would have to have an employment
       21      agreement with whatever the purchasing entity was as
   381: 1      long as -- as well as some sort of non-compete,
        2      correct?
        3                 MR. WHITWORTH:  Objection, form, calls
        4      for a legal conclusion.
        5           A     I think you're looking at maybe
        6      different definitions of value.  If you want to sell
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 7        the company at this value --

 8             Q    Yes.

 9             A    -- then there's likely to be some form

10        of employment agreement with the principals of the

11        company.  With respect to the value of -- of my fair

12        value of the company based on this lawsuit, then

13        that's not a requirement in the value of the

14        company.

15             Q    Right.  But -- but I'm asking you, as

16        far as your understanding of what you had put

17        together as some sort of value that -- that you

18        admit that, again, in order to purchase a company

19        with three employees that generate revenue and

20        forecasting revenue, you need the employees to

21        continue to be there in a services company --

382: 1         A    No --

 2             MR. WHITWORTH:  Objection, asked and

 3        answered.

 4             A    I -- I --

 5             MR. WHITWORTH:  Calls for a legal

 6        conclusion.

 7             THE WITNESS:  There are ways to value

 8        how much the company's worth and that is the

 9        valuation that we did to come up with the numbers we

10        came up with.  I'm not putting any caveats on what

11        would be required.  A buyer may require it, the

12        buyer may not require it.  It depends on what the

13        buyer wants to do.

14             There's a distinction between shelling
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

         15        the company and distinction between what is the

         16        value of my share of the company with respect to the

         17        lawsuit.

         18             Q    Would you agree that the part of the

         19        value is the goodwill of the individual engineers

         20        that are generating the work and the services?

         21             A    No.

383: 1                  MR. WHITWORTH:  Objection.

          2             Q    No, it's not based on that?

          3             A    It's based on the goodwill of the

          4        company.

          5             Q    Right.  So -- but if the engineers

          6        leave, you -- you agree there's no non-compete --

          7        again, after you left, you didn't have any

          8        non-compete, correct?

          9             A    There is no non-compete in our

         10        agreements --

         11             Q    Right.  So, again, with regard to Beacon

         12        Scientific, Mr. Bocchichio, he can leave,

         13        Mr. Saunders, he can leave at any time, there's

         14        nothing that ties them to stay to the company --

         15                  MR. WHITWORTH:  Objection.

         16             Q    -- correct?

         17                  MR. WHITWORTH:  Calls for legal

         18        conclusion --

         19             A    I have --

         20                  MR. WHITWORTH:  The question is actually

         21        contrary to the operating agreement.

384: 1             A    I --

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
  2            Q     Yeah.  Let's take --

  3                  MR. WHITWORTH:  Believe it misstates

  4         the --
```

**Note:** OBJECTION

**Pg: 384 Ln: 17 - Pg: 387 Ln: 15**

**Annotation:**

```
384:17   Q    All right.  So, again, Mr. Saunders can

    18        leave the company at any time, and therefore,

    19        anybody buying the company can't necessarily rely

    20        upon whether Mr. Saunders would still be there?

    21              MR. WHITWORTH:  Objection, calls for

385: 1        speculation about what somebody would or would not

     2        rely upon.

     3          A    Mr. Saunders is currently the only

     4        member of the company, and if he was to left, there

     5        is no company.  I'm not -- at the time when he

     6        disassociated me, the value of the company -- he was

     7        still a part of the company.  So he -- there would

     8        be no non -- the value of the company has him as

     9        part of the company.  I -- you're -- I'm not sure I

    10        understand your question.

    11              MR. WHITWORTH:  Uh-huh.

    12          Q    All right.  And with regard to your

    13        claim, as I understand it, of 49% of what -- what

    14        your expert is going to testify to is $1,435,000,

    15        that that's based upon your just paying in $85,000
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
    16        of your loan, correct?

    17                MR. WHITWORTH:  Objection.  You can't

    18        ask -- I'm going to make a speaking objection.  You

    19        can't ask Mr. Kiddy what Mr. Riley's opinion is

    20        based upon.  That's improper --

    21                MR. KAGAN:  I'm -- I'm --

386: 1                MR. WHITWORTH:  You can ask Mr. Riley

     2        what his --

     3                MR. KAGAN:  I'm going -- I'm asking your

     4        client.  Your client's claiming --

     5                MR. WHITWORTH:  I know that's why I'm

     6        objecting.

     7                MR. KAGAN:  Fine.  Your client is

     8        claiming $1,435,000.

     9                But you agree, Dr. Kiddy, you've only

    10        paid in $85,000 of your 49% interest?

    11                MR. WHITWORTH:  Objection, relevance.

    12        A     And I believe that number has been --

    13        yes, I -- to answer the question is yes.

    14        Q     All right.  All right.  You've only paid

    15        down $85,000 of the loan, but in three years of

    16        working at the company, you're claiming that the

    17        company should now pay you 1.4 million, is that what

    18        you're claiming?

    19                MR. WHITWORTH:  Objection, relevance.

    20        A     It was an extremely successful

    21        profitable company that was generating a huge amount

387: 1        of income and profit, and if I would not have been

     2        improperly disassociated, I would have benefitted
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
 3       from it.

 4               So yes, the number of years that it

 5       would take me to earn that much money as a 49%

 6       member is four, maybe; four-year return on

 7       investment, not even -- not outrageous in any shape

 8       or form.

 9               MR. KAGAN:  All right.  Take a break for

10       a second.

11               THE VIDEOGRAPHER:  Okay.  Going off the

12       record.  The time is 6:35.

13               (A break was taken.)

14               THE VIDEOGRAPHER:  Going back on the

15       record.  The time is 6:43.
```

**Note:** OBJECTION

**Pg: 394 Ln: 13 - Pg: 395 Ln: 12**

**Annotation:**

```
394:13   Q    And I think this -- I think we reviewed

    14       this one sentence I'm about to read before, but

    15       there's a couple others I want to evaluate with you.

    16               Section 5.1.1 states that, "All powers

    17       of management for the company shall be solely vested

    18       in, and the business and affairs of the company

    19       shall be managed under the direction and control of

    20       the management committee," correct?

    21               MR. KAGAN:  Objection, leading.

395: 1   Document speaks for itself.
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
     2          A     Yes, it says that.

     3          Q     Okay.  And pursuant to Section 5.1.2,

     4     what was your understanding as to who or what had

     5     the power to exercise the authority of the company?

     6                MR. KAGAN:  Objection.

     7          A     The management committee.

     8          Q     And pursuant to Section 5.1.4, what was

     9     your understanding as to how many votes of the

    10     management committee were required in order to

    11     approve any action of the company?

    12          A     Two members had to agree.
```

**Note:** OBJECTION

**Pg: 396 Ln: 3 - Pg: 397 Ln: 3**

**Annotation:**

```
396: 3   Q    All right.  And pursuant to Section

     4     5.1.7, did you understand that the manager had the

     5     full power to execute for and on behalf of the

     6     company, all documents, instruments, contracts,

     7     deeds, promissory notes and security agreements, and

     8     the like?

     9                MR. KAGAN:  Objection.  Document speaks

    10     for itself.

    11          A     Yes.  As the manager, I had that

    12     authority.

    13          Q     Okay.  And based upon your understanding

    14     of the operating agreement, did Mr. Saunders in his
```

**Case Name:** Kiddy v. Saunders
**Transcript:** [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

```
15        capacity as a member have any authority to act as

16        the manager of the company?

17               MR. KAGAN:  Objection.

18        A     No, he did not have that authority.

19        Q     And as far as you understood, did

20        Mr. Saunders have any authority in his individual

21        capacity to issue and send to you the loan default

397: 1    notice on May 8, 2020?

2                MR. KAGAN:  Objection.

3         A     No, he did not have that authority.
```

**Note:** OBJECTION

**Pg: 398 Ln: 5 - 16**

**Annotation:**

```
398: 5    Q   Okay.  Is there anything in the

6         operating agreement that permitted Mr. Saunders to

7         remove you from the management committee outside of

8         the context of Section 5 of the loan agreement?

9                MR. KAGAN:  Objection.

10        A     Not that I'm aware of.

11        Q     Okay.  And with respect to removing you

12        from the management committee, that was only if the

13        company had effected a remedy under Section 5A,

14        correct?

15               MR. KAGAN:  Objection.

16        A     Correct.
```

**Case Name:**  Kiddy v. Saunders
**Transcript:**  [6/16/2023] Kiddy - De Bene Esse 6.16.23

**DEFENDANT'S OBJECTIONS – 9/8/2025**

**Note:** OBJECTION

**Pg: 399 Ln: 13 - 16**

**Annotation:**

```
399:13   Q    Did you believe that Mr. Saunders had

     14        any authority to do that as of May 8, 2020?

     15              MR. KAGAN:  Objection.

     16          A    He did not.
```

**Note:** OBJECTION

**Pg: 403 Ln: 15 - 20**

**Annotation:**

```
403:15   Q    How are things going for you and Aither

     16        since Mr. Saunders declared default and pushed you

     17        out of Beacon Scientific?

     18              MR. KAGAN:  Objection to form.

     19          A    First six months were pretty tough,

     20        picked up after that, and we're hanging in there.
```

**Note:** OBJECTION